CHESTER H. WATEROUS, Assignee of WALTER A. MITCHELL, Appellant, v. THE COLUMBIAN NATIONAL LIFE INSURANCE COMPANY, a Corporation.—No. 38942.—186 S. W. (2d) 456.

Division Two, March 5, 1945.

Rehearing Denied, Motion to Transfer to Banc or to Modify Opinion Overruled, April 2, 1945.

1094

*Jonathan Edwards Clarke* for appellant.

1096

*Orville Richardson, James C. Jones, Jr.,* and *Jones, Hocker, Gladney & Grand* for respondent.

1100

TIPTON, J.—This is an action instituted by Chester H. Waterous, assignee of the insured, Walter A. Mitchell, against the respondent, in the circuit court of the city of St. Louis, Missouri, to recover benefits under an accident insurance policy. The jury returned a verdict in favor of the respondent and judgment was entered in accordance with the verdict.

The respondent contends that the judgment of the trial court must be affirmed, if for no other reason, because its demurrer to the evidence should be sustained. We will, therefore, proceed to review the evidence. In ruling the demurrer to the evidence, the appellant is entitled to have his evidence and all reasonable inference therefrom taken as true and to have respondent's contradictory evidence disregarded.

With this established rule of law, we will proceed to review the evidence to determine if there is substantial evidence to submit the appellant's case to the jury.

The insuring clause of the policy insured Walter A. Mitchell "against loss resulting from bodily injuries effected directly and independently of all other causes through accidental means . . . as hereinafter specified, subject to the provisions and limitations contained herein." Then followed ten "Articles" and ten "General Provisions." The sixth "General Provision" provided, in part, that "This policy does not cover death or injuries resulting from disease, infectious or otherwise . . . "

The appellant's oral testimony tended to show the following facts: The date of the alleged accident was April 2, 1934, and at that time the insured was 62 years old. He had lived an active life as a bond salesman in St. Louis, Missouri. He and his wife were Christian Scientists and he had never sought medical care. Mrs. Mitchell testified that before April 2, 1934, ▮▮▮ she had never known the insured to be ill; that he was a very active man; that he liked to mow the lawn and work in his garden and did dance quite a bit at the M. A. A. in St. Louis; that he, also, played cards and probably played cards the Saturday night before the accident. She had never known of the insured's having vomiting spells or dizzy spells or any dis-

ability of any kind before the accident. On cross-examination, she testified that about three years before the accident, or perhaps in the Fall of 1931, he had a fainting spell after the death of his son. The insured testified that he never had any sickness or fainting spells before the accident except one day after the death of his son he fainted in his office. He had just buried his son whom he adored above everything on earth, and they were "hitting on an awful soft spot." He ascribed this to an emotional reaction to the death of his son in 1931.

On April 2, 1934, the Mitchells lived at 5544 Bartmer Avenue in St. Louis in a two-story house. There was a flower garden in the yard in which insured and his wife occasionally worked. On that date, about 4:30 P. M., the insured came home and ate his supper. That day was a fairly warm day, the temperature being around 70 degrees. After he ate his supper he went into his garden and worked for about an hour raking mulch and leaves about the flower garden. He then went into the basement of his home to fix the fire for the night. It was then about 7:00 P. M. There was a hot-air furnace in the basement and an uninsulated corrugated pipe leading from the basement to the chimney. It was so low that anyone passing between the furnace and the chimney to reach the other side of the furnace would have to stoop to walk under it. It was not bolted to the chimney, but was set in a collar and fastened with wires, but could not be removed with one's hands. When he stooped to walk under the pipe, he struck his head high on the left forehead against the pipe and received what he described as a hard or "dirty" bump. He was not knocked down or unconscious, nor was the skin broken.

As he walked through the hall on the first floor, his wife saw a dirty mark about two inches round on his head. They spoke about the mark and he mentioned the accident to her. The insured then went upstairs and took a bath. He prepared for bed and read the paper a few minutes. Mrs. Mitchell then went upstairs. The dirty mark on his forehead was gone, but in its place was a red mark about ⅛ to ¼ inches high and from 1½ to 2 inches in diameter, which disappeared in about a day. He seemed pale and his head and neck ached. He then went to bed. In 10 or 15 minutes, the insured felt he wanted to go to the bathroom. He did so and then it was that he said to his wife, "Something has happened to me. I feel so bad. Something has happened to my arm." He walked back to bed, lay down, and became unconscious so that he could not be aroused for two days. When the insured regained consciousness, he could not move his right side, arm, or leg, and could not talk. In about two weeks, he regained his speech, and he told his wife about a policy that would "cover this" and told her to call Mr. Dyer, general agent of the insurance company, which she did, telling Dyer of the injury and her husband's illness.

Dr. Joseph L. Gross examined the insured at his home on behalf of the respondent on April 24, 1934. On May 11, 1934, Mr. Dyer wrote the insured "that the Company advises us that in view of the medical reports which they have relative to your physical condition they feel there is no liability under their accident policy which provides indemnity for loss resulting from bodily injuries effected directly and independently of all other causes, through *accidental* means." The letter, also, cancelled the policy under a right reserved in the policy and enclosed a check for the unearned premium. Appellant introduced this letter on the theory that it was a denial of liability and a waiver of notice of accident required by the policy.

The insured did not receive any medical aid until December, 1939, and Dr. Barnhart operated on his prostate in April, 1940. Shortly after the insured was stricken, however, Mrs. Helen Brod, a Christian Science practitioner, was called and later she went to the Mitchell home to see him. She and Dyer were the only people the insured ever told about the bump on his head and both were dead at the time of the trial.

No other claim was made upon the respondent until the year 1940, when Mr. Clarke, appellant's attorney, corresponded with Mr. Nash, respondent's vice president and general counsel.

A few days before trial, Dr. Pernoud was hired as an expert witness to answer hypothetical questions at the trial. He was a licensed physician, a general surgeon. and a teacher in the St. Louis University Medical School.

It is the respondent's contention that appellant had the burden to prove by substantial evidence (1) that the insured's paralysis resulted from bumping his head against the furnace pipe and (2) that paralysis was not caused by disease.

Respondent first contends that Dr. Pernoud's opinion that the accident caused paralysis was not "substantial evidence" sufficient to make a submissible case, since he testified that disease without trauma could have caused paralysis. It left the jury to speculate upon which two possible causes was responsible for the paralysis.

If respondent's interpretation of the evidence were true, it would be correct, (Kimmie v. Terminal R. R. Assn. of St. Louis, 334 Mo. 596, 66 S. W. 2d 561; Hunt v. Armour & Co., 345 Mo. 677, 136 S. W. 2d 312), but we do not agree with respondent's view of the evidence.

Dr. Pernoud was asked a hypothetical question that embraced the facts that we have outlined. Before he had answered the question, the record shows that respondent's attorney made an objection. We will quote the record:

"Mr. Richardson: Now, my only objection to the hypothetical question was to ask the doctor to include, take into consideration in his answer the testimony that you just heard from Mrs. Mitchell.

"A. I saw Mrs. Mitchell point to the spot on Mr. Flanagan's head

and on her own head as to the place where she saw this swelling and this bump. That is what is called the anterior, parietal region, left.

"Q. Now, including that description of the place where the bump was, doctor, can you state with reasonable medical certainty whether or not you could give an opinion as to what was the cause of the condition that this man suffered from following this injury? A. I am able to give an opinion. That opinion is that as a result of this blow on the head certain vibrations of the brain were transmitted because the brain is a very soft structure. These vibrations caused a small blood vessel within the brain to break, and as the minutes went on the blood oozed from this broken vessel, and it has no place to bleed out, so that the blood soaked in and pervaded and invaded this soft brain tissue under considerable pressure, and as it did that it destroyed the nerve cells of the brain and tore through and broke apart the nerve fibers of the brain which ran to the left, the right side of his face and body, causing a motor paralysis in that side of the body.''

We are of the opinion that this is substantial evidence that the insured's condition was caused by the blow on his head. This witness said with reasonable medical certainty that he could say that blow on the head caused the paralysis, and it "is a perfectly natural result following such injury to the brain . . . ''

This opinion is a positive assertion as to what caused the paralysis and is unlike the Kimmie and other cases relied upon by the respondent. In the Kimmie case, supra, we said: "No layman could know or have any reasonable basis for an inference that it did result from it. The opinion of the doctors that it might, could or would result from the fall is no more than an assurance that such a result was scientifically possible.''

Nor do we think that this substantial evidence given by Dr. Pernoud on direct examination was destroyed by his cross-examination. It is true that he said he would not be pinned down by certain text books, but when asked a hypothetical question that embodied the evidence above, and with the additional fact added by the attorney for the respondent that "I am assuming that the man had arteriosclerosis, . . . wouldn't there be a sufficient inciting cause or explanation of breaking of a blood vessel even without any history of force or injury?" his answer was, "If you assume that a man had a severe type of arteriosclerosis, then of course walking upstairs or attempting to fire the furnace would be an inciting cause, but unless it was a severe type of arteriosclerosis, such a small amount of exertion would be inconsequential. The apoplexies that are referred to are the mere breaking of a blood vessel. Among the causes of apoplexy are mentioned over exertion and fatigue and effects of strain; . . . ''

In the case at bar, the appellant's evidence did not show that the insured had arteriosclerosis or an enlargement of the heart and blood pressure of 176/110. When another similar question was asked on cross-examination, respondent stated ▇▇▇ that it expected to show those facts. On demurrer to the evidence, we must exclude those facts because they were developed, if at all, from respondent's evidence.

We think that with the previous good health of the insured and paralysis developing in such a short space of time after his head was bumped on the furnace pipe and the positive opinion of Dr. Pernoud as to the cause of the insured's condition, there is substantial evidence that the insured's paralysis was the result of the bump on his head.

▪ ▇▇ We do not agree with the respondent that appellant had the burden to show "that the paralysis was not caused by disease." Since the case of Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S. W. 592, 61 L. R. A. 459, 97 Am. St. Rep. 560, it has been the law in this State that the burden is on the defendant to prove that condition or death of the insured was caused by disease in those policies that had the same or similar clause that is in this policy. In that case, the policy had the phrase, "independent of all other causes," which is found in the policy in the case at bar. Regardless of the view of courts in other states, the law is well established in this State and we think it is sound.

▇▇ Whether the insured's paralysis is the result of disease, is a question for the jury after the appellant made a prima facie showing of the accident resulting in the insured's condition from the bump he received on his head. Appellant's evidence showed that the insured was in good health prior to the accidental bumping of his head. The respondent had testimony that might tend to show insured's paralysis was due to disease. It follows that the respondent's demurrer to the evidence was properly overruled.

▇▇ Briefly, the appellant's first four points in his brief deal with waivers of defense by the respondent. First, he says that by respondent's letter of May 11, 1934, respondent denied liability solely on the ground that the insured's condition was not the result of an accident, and, therefore, respondent waived any notice that may be required under the terms of the policy; and, second, its denial of liability in June, 1940, upon the ground that the failure to give notice waived all defenses, and, therefore, the judgment of the court must be for the appellant.

If we follow appellant correctly through thirty-two pages of his brief, he says in effect that his requested instruction for a verdict should have been given, for in his closing sentence in his brief, he says, "Accordingly, we submit that the judgment should be reversed outright."

Respondent contends no such question is before us, for the reason that appellant failed to raise such a point in his motion for a new

trial. Appellant's motion for a new trial raises thirty-two points, but in none of them does appellant complain that his requested instruction directing the jury to return him a verdict was refused. Therefore, this question is not before us for review. Peterson v. Kansas City, 324 Mo. 454, 23 S. W. 2d 1045; Wilhite v. Armstrong, 328 Mo. 1064, 43 S. W. 2d 422; Spotts v. Spotts, 331 Mo. 917, 55 S. W. 2d 977, 87 A. L. R. 660. Also, Mo. Digest, Appeal and Error, Key 301.

Appellant next contends that Exhibit "A" was improperly admitted in evidence. This is a letter written by Mrs. Helen Brod, a Christian Science practitioner, to George Dyer, the general agent of the respondent. At the time of the trial, both Mrs. Brod and Dyer were dead. The letter was in reply to a letter written by Dyer to Mrs. Brod and was not written with the knowledge or consent of the insured, nor is there any evidence showing that she was the insured's agent. It gave her conclusions as to the insured's condition. It states "he was in an almost helpless condition with what seems to be a stroke of paralysis . . ."

Since it does not appear that the insured was connected with this letter in any way or had ever seen it, this exhibit was obviously hearsay evidence, self-serving and incompetent; (Wahl v. Cunningham, 232 Mo. 21, 56 S. W. 2d 1052) but respondent contends that this letter was admissible for the reason the appellant was seeking to submit the issue of vexatious delay to the jury. In other words, this letter tended to show the good faith of respondent in refusing to make payment under the policy, and if the appellant wanted to limit the effect of this letter, it was his duty to request an instruction to do so.

We do not agree with respondent. Mrs. Brod was not a physician and her conclusions as to the insured's physical condition would have no probative force. "The good or bad faith of an insurance company in refusing to pay after demand is to be determined by the evidence adduced at the trial upon the merits of the controversy, and not by ex parte affidavits [or statements or letters] produced to the company as preliminary proof, or for the company's information to induce voluntary payment." Travelers Insurance Co. v. Sheppard, 85 Ga. 751, 12 S. E. 18. Quoted with approval in the case of New York Insurance Company v. Ittner, 200 S. E. (Ga.) 522, 1. c. 530.

Nor do we think that Exhibits D, E, F, and G were admissible. They were in effect inter-office communications. They contain self-serving statements and conclusions. The insured was in no way connected with these exhibits, nor did he have any knowledge of them. They violated the hearsay rule and are not admissible.

Respondent, also, contends that its exhibits are admissible because they tend to show its good faith on the question of vexatious delay. We have already answered that contention. Next, respondent contends that since the appellant introduced the letter of May 11, 1934,

which declined payment, that it had a right to offer these exhibits on the theory that it is entitled to get before the jury the whole of the transactions even though they contained self-serving statements which would be otherwise inadmissible. Among the cases cited is Friedman v. Griffith, 196 S. W. 75.

There would be some merit in respondent's contention if these exhibits were correspondence between the insured and respondent, but such is not the case. The insured did not even know of their existence. These self-serving statements were prejudicial to appellant.

Again, the respondent says that these exhibits are admissible under the rule that declarations made in the course of business, at or about the time the facts or facts stated occurred, by third persons who are unavailable as witnesses, are admissible.

Exhibit D was a medical report made by the respondent's physician, Dr. Joseph L. Gross. He was an available witness, and, in fact, was a witness in this case.

Two of the other exhibits were letters written by the general agent to his principal; ". . . in effect, they were communications within the respondent's household, and amounted to nothing more than the defendant [respondent] talking to itself." Brown v. Missouri State Life Ins. Co., 254 Pac. (Okla.) 7, l. c. 9.

The admission of these exhibits was prejudicial to appellant and, for that reason, a reversal of the judgment is manifest.

Other alleged errors are complained of, but as they are of such a character that they will not necessarily arise upon another trial of the cause, they will not be considered.

For the reasons above stated, the judgment is reversed and the cause remanded. All concur.