Frances GENNARI, Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, a Corporation, Respondent.

No. 47659.

Supreme Court of Missouri,

Division No. 2.

April 11, 1960.

Motions for Rehearing or to Transfer to Court en Banc Denied May 9, 1960.

William G. Phillips, St. Louis, for appellant.

Fordyce, Mayne, Hartman, Renard & Stribling, William W. Sleater, Jr., R. P. Stanislaw, St. Louis, for respondent.

ELMO B. HUNTER, Special Judge by transfer order.

This is an appeal by plaintiff, Frances Gennari, from a judgment of the Circuit Court of St. Louis County, entered in accordance with the jury's verdict, for defendant, The Prudential Insurance Company of America.

Plaintiff sued on two life insurance policies issued on the life of her husband, Joseph Gennari. The defendant had paid the amounts due under the life insurance provisions of the policy but refused to pay the double indemnities payable for death by accidental means.

On appeal to the St. Louis Court of Appeals that court, in an able opinion prepared by Commissioner Doerner recommending the reversal and the remanding of the case for a new trial, transferred the case to this court for a re-examination of the existing law. See, Gennari v. Prudential Life Insurance Company of America, Mo.App., 324 S.W.2d 355.

Joseph Gennari was 57 years old at the time of his death. His usual occupation was that of pastry cook, but he accepted special engagements to carve ornamental table decorations out of ice.

On July 20, 1954, he was employed by the Norwood Hills Country Club to prepare ice carvings for a social event to be held at the club. He performed his work in the walk-in icebox located in the basement of the club house. Witnesses made varying estimates of the temperature in the icebox while he was ice carving, ranging from 31 degrees to 38 degrees Fahrenheit, and described it as being such that beer would not freeze and ice would not melt. It was cooled by refrigerating pipes suspended along its ceiling and walls. The insured stood on the concrete floor of the 4-foot-wide 9-foot-long icebox and worked with a hammer and chisel on a 2½-foot square block of ice on a table. He did not wear gloves and his outer garments were a pair of pants and a shirt. The door of the icebox remained open. There was testimony that the temperature at the Federal Building in St. Louis, about eight miles from the country club, was 102 degrees. A thermometer located in the hallway near the icebox read 103 degrees. The natural heat in the hallway was augmented by heat from boilers located in another part of the basement.

The record does not disclose the total length of time the insured was in the icebox, but it was more than one hour and

sufficiently long for him to have completed carving an ice bowl and a bird and to partially complete a swan.

At that point, the insured was seen to lay down the hammer and ice chisel he was using, and to step through the opened door of the icebox into a hallway. He turned to his right, rounded a corner, proceeded on into a second hallway and had taken about twelve steps (placing him about 40 feet from the icebox) all in apparently normal manner when he was seen to stagger.

Witnesses caught him before he struck the floor and assisted him into a chair. He was asked if he was sick. He mumbled the single word "yes," and thereafter said nothing. He had not mentioned any reason for leaving the icebox to the club's employee who was assisting him in his ice carving work, and apparently was headed toward an employees' locker room and lounge.

Dr. Harold Selle, a club member who was in the men's grill, was summoned and rendered assistance to the insured.

Dr. Selle described him as being in a semiconscious condition, perspiring profusely, and undergoing minor convulsions. He took the insured's blood pressure and found it to be 230 over 140. The insured's temperature was not taken at that time. Other witnesses testified that insured's eyelids remained open; his eyes were set and staring straight ahead; were rolled back up into his head, and that he was pale, dry and not sweating, but was wet from ice.

He was taken to the St. Louis County Hospital in an ambulance and upon admission at 7:25 p. m., was found to have temperature of 101 degrees and blood pressure of 250 over 180. He was put under oxygen, given glucose and medicines, but by midnight his temperature had arisen to 105.4 and ice, wet sheets and a fan were used to reduce it to 100.2 degrees at 1:30 a. m. The hospital record contains many references to such exterior signs as sluggish reflexes, claw-like hands and jerking extremities and his failure to ever regain consciousness.

His death occurred at 3:00 a. m. on July 21, 1954, approximately 10½ hours after coming out of the icebox.

The sole issue between the parties at the trial was whether or not the death of the insured resulted from accidental means within the meaning of the policy provisions for double indemnity.

In support of her contention that the emergence of the insured from the cold icebox to the hot hallway affected the heat control center in the brain and caused the insured's death, plaintiff presented Drs. Sylvester H. Pranger and Harold Selle as medical witnesses.

It was Dr. Pranger's opinion that the insured suffered a great shock, equivalent to a heat stroke, caused by the sudden and radical change in temperature from cold to hot, which affected the heat control center of the body, located in that part of the brain called the thalamus, causing an edema of the brain, and resulting in the insured's death. In this he was supported by Dr. Selle, who also attributed the insured's death to a cerebral vascular accident, probably precipitated by the extreme change in the heat environment. In his opinion the unusual temperature change suffered by the insured caused a very obvious and marked insult to the insured's vascular system and that the temperature influence was a very large deciding factor in his death. He admitted he did not know the precise and direct cause of death.

It was defendant's contention that the insured did not die from accidental means. It introduced evidence to sustain its position that the insured's death was caused by a cerebral hemorrhage, due to hypertension and hypertensive cardiovascular disease and that the heat played no part in his death.

This evidence revealed that shortly prior to April 30, 1953, the insured had been

rejected for insurance. On April 30, 1953, he went to Dr. Birkle Eck for a cardio-vascular investigation, although according to Dr. Eck's case history he had no symptoms. Dr. Eck's report of the result of his examination, which was read to the jury, disclosed that the insured weighed 161 pounds; had blood pressure of 160 over 110; and had tortuous, thickened radial and temporal arteries. Insured's heart rhythm was regular. His fluoroscopic examination revealed the cardiac border showed slight prominence on the left which is compatible with early left ventricular hypertrophy. There were increased hilar markings.

The treatment prescribed by Dr. Eck was to gradually reduce weight by use of a high protein, low fat diet. He saw insured on May 21, 1953, and noted a weight of 162 pounds and blood pressure of 150 over 100. He saw insured again on September 17, 1953, and noted his weight was 161 pounds and his blood pressure was 160 over 104. He did not see the assured again, and his final diagnosis was "Hypertensive cardiovascular disease; arteriosclerosis; peripheral."

Defendant's medical witnesses were Dr. Curtis Lohr, Superintendent and Medical Director of St. Louis County Hospital, Dr. Orhan Sansoy, Chief Resident of Medical Service of that hospital, and Dr. Charles W. Miller, a physician who limited his practice to internal medicine. It was their opinion that the insured's death was caused by a cerebral hemorrhage due to hypertension and hypertensive cardiovascular disease. Dr. Lohr reviewed the insured's hospital record, which admittedly did not indicate what the insured had been doing before being stricken other than being found unconscious at work. Dr. Sansoy testified there was no heat prostration or heat stroke. Dr. Miller testified the insured died of cerebral hemorrhage not caused by heat but which was caused by increased blood pressure.

Plaintiff's first assignment of error is that the trial court refused to give her offered Instruction No. B which told the jury that the burden was on the defendant to prove that the proximate cause of the death of the insured was his pre-existing condition of hypertensive cardiovascular disease and arteriosclerosis. Plaintiff's contention is (1) that defendant had pleaded that the death of the assured resulted from bodily infirmity or disease, and (2) that the defendant had the burden of proof on its pleaded defense that the death of the insured resulted from bodily infirmity or disease.

In support of her contention plaintiff cites a long list of cases, commencing with Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S.W. 592, 596, 61 L.R.A. 459, 97 Am.St.Rep. 560, and ending with Waterous v. Columbian National Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456. These cases did place the burden of proof on the respective defendants to prove that the condition or death of the insured resulted from bodily infirmities or disease.

On the other hand, defendant relies upon numerous cases to support its contention that (1) its answer was only a general denial of plaintiff's allegation that death was due to accidental means; (2) that the burden of proof was upon the plaintiff to establish that the insured's death was caused by accidental means; and (3) that under a general denial it was entitled to show that the insured's death resulted from disease and that it did not have the burden of proving the death was caused by disease; citing, among others, Layton v. Metropolitan Life Ins. Co., Mo.App., 89 S.W.2d 576; Krug v. Mutual Life Ins. Co. of New York, 235 Mo.App. 1224, 149 S.W.2d 393, 403; and Hughes v. Provident Mutual Life Ins. Co. of Philadelphia, Mo.App., 258 S.W.2d 290.

The St. Louis Court of Appeals expressed its preference for the view that the so-called defense that an insured died of disease is not an affirmative defense but is merely a denial of an essential element of the plaintiff's case, death by accidental

means; and that the clause in a policy of this kind relative to death from bodily or mental infirmities or disease is nothing more than a redundant clause. However, in view of the Waterous decision, supra, it constrainedly held that the trial court erred in refusing to give plaintiff's Instruction B and asked this court to re-examine the law on the subject.

The St. Louis Court of Appeals conceded, as defendant agreed, that a distinction appears to have been drawn between those cases in which the defendant affirmatively pleads that the death of the insured resulted from bodily infirmities or disease, and those in which it has not been affirmatively pleaded. Hence, it attached importance to determining whether the answer affirmatively pleaded death by disease as a defense. It construed the answer as having been amended by the conduct of the parties during the trial to plead death from disease as an affirmative defense.

The answer after certain admissions and denials set out those provisions of the policy providing the accidental death benefit would be payable upon receipt by defendant of due proof that the death of insured occurred as a result directly and independently of all other causes of bodily injuries effected solely through external, violent and accidental means and that no accidental death benefit would be payable if the death of the insured resulted directly or indirectly from bodily or mental infirmity or disease in any form. Defendant then alleged, " * * * plaintiff has failed to furnish defendant due proof that the death of the said Joseph Gennari came within the Accidental Death Benefit provision of said Policy No. 7,126,861."

We are willing to accept that construction of the answer viewing it as affirmatively pleading that the death of the insured resulted from disease, without independent analysis of our own, solely because we deem it unimportant in view of what upon our re-examination of the principal question we conceive to be the proper and applicable rule of substantive law.

The burden of proof to establish each and every essential element of her cause of action rests upon plaintiff and so remains until the end of the case. That burden of proof never shifts to the defendant. It is indisputable that an essential element of plaintiff's recovery is proof that the death of the insured resulted from accidental means. The only sound conclusion is that the burden of proof to establish that the death of the insured resulted from accidental means rests upon the plaintiff, and remains upon the plaintiff throughout the case. See, Phillips v. Travelers' Ins. Co. of Hartford, Conn., 288 Mo. 175, 231 S.W. 947; Boring v. Kansas City Life Ins. Co., Mo.Sup., 274 S.W. 2d 233; and Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56.

The effect of another established principle of law must be considered. The burden of proof on all affirmative defenses rests upon the defendant as the asserting party. Section 509.090 RSMo 1949, V.A. M.S. This burden of proof to establish affirmative defenses is on the defendant from the beginning, and it remains upon the defendant throughout the case.

We come to the crucial question. Is proof of the fact that the death of the insured resulted from disease proof of an affirmative defense, or is it merely proof of a fact inconsistent with and destructive of the essential element of plaintiff's case that the insured's death resulted from accidental means?

As stated in the St. Louis Court of Appeals opinion, if the plaintiff well carries his burden of proof, he thereby disproves, at least inferentially, that the insured's death resulted from any bodily infirmity or disease. See, also, Layton v. Metropolitan Life Ins. Co., supra. There can be no doubt but that under a general denial the defendant has the right to adduce

evidence showing the insured died of disease. This is but a means of proving he did not die from accidental cause which the plaintiff has alleged as an essential part of her case. It is wholly illogical to say that this very same evidence turns into an affirmative defense if the answer asserts its substance by alleging death was caused by disease, or that this allegation in the answer is the allegation of an affirmative defense. Such an allegation is entirely consistent with and within the scope of a general denial. It is nothing more than an assertion that he did not die of accidental means, and is not an allegation of an affirmative defense.

█ In so saying we acknowledge that if the insurer pleads an exception to the general liability clause of the insurance policy, it is deemed thereby to have set up an affirmative defense, and assumes and has the burden of proving it. This sound rule apparently is the basis upon which some of the cases upon which plaintiff relies mistakenly endeavor to justify their holding that the burden of proof of death by bodily infirmity or disease is upon the defendant.

The life insurance policy before us has some stated exceptions. After providing the general coverage it reads, "provided, however, that no accidental death benefit shall be payable if such death resulted from" 1, suicide, or 2, gas, or 3, military service, or 4, riding in a submarine or certain aircraft, or 5, war. As pointed out in the St. Louis Court of Appeals opinion, if the insured was killed by accidental means while riding in a nonscheduled, casual flight, a defense to that effect would be an affirmative defense. See, Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615. This is an example of a true exception to the general liability clause. Even though death occurred through accidental means, the particular accidental means is excluded from the general coverage by reason of a stated exception in the policy. The deter-

minative factor in the question before us is that the allegation and proof of death by disease is not an exception to the general liability clause but rather is disavowal of and disproof by refutation of an essential part of the general liability clause. Accordingly, the clause in the policy relative to death from bodily or mental infirmities or disease is not an exception to the general liability clause governing double indemnity and is, as the St. Louis Court of Appeals viewed it, essentially a redundant statement.

We do not undertake to review case by case those decisions in which the St. Louis Court of Appeals and the defendant sense support for a distinction in result based upon whether or not the defendant affirmatively alleges that the death of the insured resulted from bodily infirmity or disease. We are content to declare that any such language or holding is unsound and is not to be followed. The true rule is that such an allegation is not the allegation of an affirmative defense and the burden thereon does not rest upon the defendant. In so saying, we note we are supported by other jurisdictions. See, 46 C.J.S. Insurance § 1297, p. 357; 20 Appleman, Insurance Laws and Practice, § 11991, note 4.

It follows that the trial court correctly refused to give Instruction No. B which told the jury that the burden was on the defendant to prove that the proximate cause of the death of the insured was his pre-existing condition of hypertensive cardiovascular disease and arteriosclerosis.

The St. Louis Court of Appeals held that reversible error was committed by the trial court in the giving of Instruction No. 2 at defendant's request.

Instruction No. 2 told the jury that if they found and believed insured "died from a cerebral hemorrhage and that at or prior to such time he had a hypertensive cardiovascular disease, arteriosclerosis, and malignant hypertension or high blood pressure, and you find that such diseased condition *brought about or caused his death*

*at such time,* your verdict shall be for the defendant, unless, under other instructions of the court you find and believe from the evidence that the death of the insured was the result, directly and independently of all other causes, of bodily injury, if any, sustained solely through external, violent and accidental means as such is defined by the court." (Italics ours.)

Plaintiff contends this instruction, by its use of the words "brought about or caused his death," permits a defendant's verdict even though the disease may be merely the predisposing or remote cause of the insured's death whereas if the active, efficient proximate cause is an injury suffered through accidental means the plaintiff is entitled to recover. The St. Louis Court of Appeals held that the instruction in failing to find that the disease was the direct and proximate cause of the insured's death, was prejudicially erroneous.

It is well settled that although a person may have a weakened body and be infirm as the result of such things as age or disease, nonetheless if death is directly caused by external, violent and accidental means the accidental death benefit provisions apply and recovery may be had. For an injury which might naturally produce death in a person of a certain condition of health is the cause of his death, if he dies by reason of it, even if he would not have died if his previous health had been different. In such event the condition of previous health is merely a predisposing and remote cause and not the direct, proximate cause, as contemplated by the policy, notwithstanding such condition might have cooperated, concurred in and contributed to death. Cf. Hughes v. Provident Mutual Life Ins. Co., supra; Elbe v. John Hancock Mutual Life Ins. Co. of Boston, Mass., Mo. App., 155 S.W.2d 302; Smith v. Washington National Ins. Co., Mo.App., 91 S.W.2d 169, 174–75; Fetter v. Fidelity & Casualty Co., supra; Young v. New York Life Ins. Co., Mo.App., 221 S.W.2d 843, affirmed 360 Mo. 460, 228 S.W.2d 670.

Instructions must be read as a whole, and if the over-all effect of the instruction is to misdirect or mislead the jury as to a vital issue by incorrectly stating the substantive law the instruction is erroneous. Read in its entirety Instruction No. 2 is at best confusing and misleading. In the first part it incorrectly states the substantive law by indicating that a finding that death "was brought about or caused" by disease, even though the disease may have been only a remote or predisposing cause, precludes recovery by the plaintiff. This is a misstatement of the law. Then the instruction continues by saying "unless" you find that death resulted of bodily injury sustained solely through external, violent and accidental means. This latter part of the instruction, while couched in the terms of the insurance policy, does not serve sufficiently to correct the earlier misstatement of the law applicable to the critical factual issue in this case. The giving of the instruction in this form resulted in prejudicial error.

Plaintiff also charges other error in Instruction No. 2 for the reason it contains the words "malignant hypertension" when there was no evidence to support the use of those words. However, as noted by St. Louis Court of Appeals, that term is used in the hospital record, the death certificate and the testimony of Dr. Sansoy. We find no merit in the contention.

Additional error is claimed by the trial court having admitted into evidence, over plaintiff's objection, that portion of the hospital record which read, "History was obtained from wife and son. They both stated patient was doing very well up until one hour prior to admission when he was found unconscious at work. He has had hypertension as high as 180 systolic for the past 12 years." Plaintiff charges this is but hearsay on hearsay, and is not admissible, citing Baugh v. Life & Casualty Ins. Co. of Tenn., Mo.Sup., 307 S.W.2d 660. In that case the hospital record read, "Pt. states that at age 7 he had chicken

pox and was told by a doctor he had a leaky heart." We held this statement admissible as an admission against interest tending to prove the falsity of the representation by deceased, in his insurance application, that he had never had heart disease. In the case before us, the insured's wife who made the statement is the plaintiff and that portion of the hospital record containing her statement is admissible as an admission against her interest.

█ Defendant's Instruction No. 4 defines "accidental means" as used in other instructions. Plaintiff charges error in that it did not also define "external," "violent," "cerebral hemorrhage" or "bodily injuries," as used in Instruction No. 2. Plaintiff does not contend the definition given is erroneous, and if plaintiff desired an instruction defining the other terms she should have offered one. Defendant cannot successfully be charged with error because it did not by instruction define other terms that plaintiff wishes had been defined. See, Henson v. Jasinsky, Mo.Sup., 251 S.W.2d 601; Nelson v. Tayon, Mo.Sup., 265 S.W.2d 409.

We reach plaintiff's final assignment of error. Instruction No. 3 told the jury in part that a finding by them that the death of the insured resulted directly and independently of all other causes from bodily injuries sustained solely through external, violent and accidental means, "cannot rest upon conjecture or speculation upon the part of the jury, but must be found by the jury from the facts given in evidence in the case, * * *."

Plaintiff contends this portion of the instruction in effect erroneously advised the jury that it could not draw an inference that the extreme change in temperature caused the insured's death, and that the instruction could have avoided the error if after the above quoted portion it had contained such additional words as "and the reasonable inferences deductible therefrom."

Plaintiff reasons there were doctors' opinions (1) that the heat killed insured, and (2) that the heat did not kill insured; and the precise and exact cause of death was not a known fact because there was no autopsy. Thus, says plaintiff, the circumstantial evidentiary facts of insured being in the icebox, out into the heat, falling over and then dying within ten hours would support as a reasonable (supporting) inference that the heat killed him, and yet, under the instruction the jury was not allowed to draw reasonable inferences.

The crucial question is, did this cautionary portion of the instruction misdirect the jury by advising them that they could not draw reasonable inferences from the facts in evidence. If it did, it resulted in reversible error. While this is a close question, the St. Louis Court of Appeals thought so, and we agree.

█ Juries are composed of laymen relatively unfamiliar with legal language and nice legal distinctions. To such a layman, this language may well mislead, whereas to a lawyer or judge, familiar by profession with the fact that it is proper for jurors to engage in some surmise and speculation upon the facts in evidence in the process of drawing reasonable inferences therefrom the instruction would not mislead. Members of the jury as reasonable men might conclude that the intended meaning of the instruction was that they could not draw reasonable inferences from the facts in evidence. In any event, it tends to bring uncertainty to them as to the proper rule to be applied in determining a critical issue. Instructions are framed for the proper and clear guidance of the laymen who compose juries. If a party wishes to offer a cautionary instruction and the trial court, in the exercise of its discretion, wishes to give it, the instruction must not be such as to misdirect or confuse the layman jury.

In West v. St. Louis Public Service Co., 361 Mo. 740, 236 S.W.2d 308, 312, we ex-

amined an instruction which provided, " * * * (if) you are not able to make a finding that defendant was liable without resorting to surmise, guesswork and speculation outside of and beyond the scope of the evidence, and the reasonable inference(s) deductible therefrom." We held that this cautionary portion of the instruction was a correct statement of the law but that if it had been reasonably susceptible of the meaning that the jury was not permitted to surmise or speculate upon the facts in evidence in the process of drawing reasonable inferences therefrom it would be erroneous.

Prejudicial error having been committed in two of defendant's instructions, the judgment is reversed and the cause is remanded for a new trial.

LEEDY, P. J., and EAGER and STORCKMAN, JJ., concur.