**Michael Scott LEMM, pro ami et al., Respondents,**

**v.**

**Ida GOULD and Dan Gould, Appellants.**

No. 53018.

Supreme Court of Missouri, Division No. 1.

Jan. 8, 1968.

Motion for Rehearing or to Transfer to Court in Banc Denied March 11, 1968.

Fred J. Freel, Norman O. Sanders, Claude L. Schenck, Kansas City, for respondents; Sheridan, Sanders, Millin, Peters, Carr & Sharp, Kansas City, of counsel.

William H. Sanders, Dean F. Arnold, James Borthwick, Max Bagby, Kansas City, for appellants; Blackwell, Sanders, Matheny, Weary & Lombardi, Bagby, Benjamin & Winston, Kansas City, of counsel.

HOUSER, Commissioner.

Michael Scott Lemm, a child three years and ten months of age, was injured when he climbed through an opening between a baluster and a wooden column and fell to the ground from the front porch on the fourth floor of an apartment building in Kansas City. Michael sued Ida and Dan Gould, alleged owners of the building, in Count I for $250,000 damages for personal injuries. Michael's parents sued the Goulds in Count II for $100,000 damages for loss of Michael's services. From a judgment against both defendants, entered upon a jury verdict for plaintiffs for $179,000 on Count I and $12,000 on Count II, both defendants have appealed.

Michael climbed through the opening between the last baluster and the square wooden column (the right-hand side of the photograph):

Plaintiffs' petition alleged that the porch was under the control of defendants and charged negligence in (1) failing to repair the baluster so as not to leave an opening through which Michael could pass; (2) installing wire fence from the top rail of the baluster to within 2–3 feet of the ceiling instead of extending it to the floor of the porch, thereby permitting an opening to continue to exist through which Michael crawled and then fell; (3) repairing so as to create a hidden defect, namely, an open-

ing of sufficient size for Michael to crawl through; (4) permitting said hidden defect and hazard to exist over a long period of time and in failing to notify or warn plaintiffs thereof; (5) failing to make a thorough inspection of the porch after repair work was completed and failing to make periodic inspections thereof.

Plaintiffs' case was submitted to the jury by Instructions Nos. 2 and 4 (MAI No. 22.05, modified), which were identical except that No. 2 submitted the case as to defendant Dan Gould and No. 4 submitted the case as to defendant Ida Gould, as follows:

"Your verdict must be for the plaintiffs Michael Scott Lemm and Mr. and Mrs. Lemm and against the defendant___Gould if you believe:

"First, there was a relationship of landlord and tenant between___Gould and Mr. and Mrs. Lemm regarding the 4th floor apartment, and

"Second, one half of an upright or baluster was missing from the porch railing and as a result the porch was not reasonably safe, and

"Third, the porch was in the possession and control of defendant___Gould for the purpose of making repairs, and

"Fourth, defendant___Gould knew or by using reasonable care should have known of this condition, and

"Fifth, defendant___Gould failed to use ordinary care to make the porch reasonably safe, and

"Sixth, as a direct result of such failure, plaintiff Michael Scott Lemm was injured."

Appellants' point of chief insistence is that the court should have directed a verdict for defendants, and erred in submitting the case to the jury under Instructions Nos. 2 and 4 on the theory of partial reservation by defendants of control over the porch, because the premises, including the porch,

were demised to the tenants for their exclusive possession; that a landlord is not liable for injuries caused by defects in premises demised to a tenant for his exclusive possession; that an agreement to make repairs does not constitute the possession or control on the part of the landlord necessary to make the latter liable; and that defendants had no duty to alter the slightly wider spacing of the corner baluster in the railing on the private porch appurtenant to the Lemms' apartment.

Considered in the light most favorable to the prevailing parties, the plaintiffs, the jury was warranted in finding these facts bearing on the question of control over the porch:

The 4-story apartment building, located at 1207–1209 Admiral Boulevard, faces north. There are two apartments on each level. Each of the eight apartments has a front porch. At the corners of each porch large wooden columns are located. Wooden railings 30 inches high extend from the front of the building to each of the columns and between the columns. The railings, or banisters, are supported by wooden balusters. The balusters are shaped like an hour glass. The base and top of each baluster are $3\frac{1}{2}$ inches square. The balusters are spaced three inches apart. The maximum distance between the balusters (measured at their narrowest points) is 5 inches. In 1956 the porch was repaired and remodeled by an independent contractor. The wooden column on the northeast corner of the porch of the apartment later rented to the Lemms (fourth floor east) was boxed in (made square instead of round). This enlarged the column. As a result it was necessary to remove one upright baluster. It was not replaced. As a result the space between the edge of the column and the first baluster was increased from 3 to 5 inches, and the space between the narrowest part of the baluster and the column was increased from 5 to $6\frac{1}{2}$ or 7 inches. It was through this opening that Michael passed. This opening could have been reduced by sawing an upright baluster in half and attaching the

sliced-in-two baluster to the boxed-in column, but this was not done. An architect testified that the manner in which the work on the porch was done was crude and rendered it unsafe for small children; that it could have been made safe by firmly securing the wiring to the porch floor, by installing a solid railing or by replacing part of the missing baluster. A 9-year-old girl was able to put her head in the space between the first baluster and the base of the column.

Michael's parents rented the apartment for $20 a week, which was to include furniture, all utilities and all repairs. "Anything that would have to be replaced would be replaced. * * * Any repairs that would come up. They [the Goulds and the resident manager] kept a separate key and they gave [the Lemms] one key and they kept a separate key for themselves in case there would be any emergency like a water pipe or gas pipe or anything like that—something would break or something [when the Lemms] weren't at home they still could enter the apartment." The Lemms were advised by the resident manager that "they" would use this key to enter the apartment "to do any repairs they might think necessary." Keys to the various apartments were kept on a keyboard. The Lemms moved in on April 12, 1963. The family consisted of Nathan and Mamey Lemm and their children. Michael was then 2½ years old. During the rental negotiations Mrs. Lemm noticed that the front porch of the apartment on third floor west was protected by wire screening strung between the columns. The rental agent agreed that the porch on four east would be made safe; that "as soon as possible" wiring would be put from about a foot from the ceiling to the floor of the porch, the same way that three west was wired, "and this wire would reach all around the porch" to "make it safe for the children to play." There was no yard at the apartment building in which children could play. Although complaints were made to the manager of failure to install the wire on the porch, nothing was done until May or June,

1964, more than one year after the Lemms moved into the apartment, when wire screening was put in place on the Lemms' front porch. It ran from the *top* of the wooden railing to a point 2 or 3 feet below the ceiling. The space between the *top* of the railing and the floor was not covered by the wiring. Mr. Gould and a helper put the wire up without asking Mrs. Lemm how she wanted the wire. Mrs. Lemm complained to the manager that they had not put up the wire like they said they would. The manager later said that she tried to reach Mr. Gould but "it was very hard to locate him."

Between April 12, 1963 and the date of the injury to Michael (July 7, 1964) Dan Gould replaced a broken window, repaired rat holes under the kitchen sink, replaced a couch that was worn, sprayed bug powder around the baseboard and crevices, and installed the wire screening. The window repair and the spraying were done while the Lemms were away from the apartment. Mr. Gould used a key to gain entrance to the apartment on these occasions, and did not announce his coming. Four or five days before the window was replaced Mrs. Lemm notified Mr. Gould about the broken window and he said that he would fix it as soon as he could. When the wire screening was installed on Lemms' front porch Mr. Gould gained access to the porch through the adjacent apartment (fourth floor west), which was vacant, and by climbing over the railing which divided the front porch in two.

Plaintiffs seek to recover under the rule that "a landlord is under a duty to exercise ordinary care to keep the portions of the premises which he retains in his control is a reasonably safe condition for the use intended and is liable for damages for personal injuries resulting from his failure to perform that duty." Peterson v. Brune, Mo.Sup., 273 S.W.2d 278, 280 [1]. Plaintiff's theory is that defendants retained control of the porch for the purpose of making repairs in order to make it safe for the Lemm children to play on, and therefore

defendants were duty bound to make the porch reasonably safe for the use of Michael.

The possession or control which must be shown in order to make a landlord liable under this rule is not to be found merely in the obligation of the landlord to make repairs or the right to enter the premises. Lahtinen v. Continental Bldg. Co., 339 Mo. 438, 97 S.W.2d 102, 106 [3]. There must be something more—some additional fact or facts from which a jury could infer that under the agreement the tenant gave up and surrendered his right to exclusive possession and control and yielded to the landlord some degree or measure of control and dominion over the premises; some substantial evidence of a sharing of control as between landlord and tenant. In order to be bound to keep the premises in a reasonably safe condition the landlord need not have reserved such a degree of control as to be entitled to admit or exclude others from the premises. It is sufficient that he retained a general supervision over the premises for a limited purpose such as the making of repairs or alterations, and the right to enter the premises and make repairs upon his own initiative and responsibility.

There were sufficient facts in evidence to entitle the jury to draw the inference that these landlords were vested with this degree of control and dominion over the premises. In addition to the agreement to repair and replace, the landlords retained a key to the apartment not only for emergency uses but also to use to enter the apartment "to do any repairs that they might think necessary." This gave them the right to make repairs on their own initiative and responsibility, without obtaining the consent of the tenants. This carried with it the implied right to enter for the purpose of inspecting the premises to determine what repairs were necessary. This reservation of right was not alone for the benefit of the tenants but enured to the benefit of the landlords because it entitled them, during the rental period, to take whatever action in the field of repairs and replacements deemed necessary to prevent waste and to protect their reversionary interests. Along with this right and benefit goes the correlative responsibility to keep the premises in reasonably safe condition for the use intended.

Illustrating and emphasizing the fact that the landlords reserved this degree of control there is the further fact that the landlords actually made repairs and replacements prior to the injury, pursuant to the agreement. A legitimate inference from the evidence is that it was agreeable with the tenants for the representative of the landlords to use the retained duplicate key to gain access to the premises, in the absence of the tenants from the apartment, without seeking or gaining their permission prior to their entry, and to make such repairs (the window, and the installation of the screening on the porch) or perform a service (spraying for bugs) without consulting the tenants. There is no evidence of any objection on the part of the tenants to this practice. From their apparent acquiescence it can be inferred that the landlords' free access to the premises for these purposes was part and parcel of the understanding and agreement between the parties.

Tucker v. Taksel, Mo.App., 345 S.W.2d 385, is a case in point. There was an agreement to repair. The landlords kept a key to each apartment, which was occasionally used to enter for the purpose of decorating, replacing fuses and plumbing. The landlords made all repairs inside and outside the building. They repaired furniture, plaster, plumbing, porches, windows and window sills "or anything else." Plaintiff was injured by falling through an open, unscreened window, the sill of which had deteriorated. The landlords replaced the window sill. Plaintiff's theory was that the landlords had not surrendered full control of the premises to the tenant but had retained partial control for the purpose of making repairs; that the landlords were

obligated to make the repair and having failed to do so were liable for resulting injuries. The St. Louis Court of Appeals held that "* * * such an agreement, coupled with retention of a duplicate key and the making of such repairs [before and] after a casualty, might well give rise to an inference that the owner did reserve partial control for the purpose of making such repairs." 345 S.W.2d, l. c. 387.

In De Clara v. Barber Steamship Lines, 309 N.Y. 620, 132 N.E.2d 871, the landlord agreed, upon notice, to make repairs; had the right at any time to examine the premises and make repairs, and maintained watchmen and a maintenance crew for the purpose of making repairs. The landlord was held to have had such control of the premises as to render the landlord liable in tort to a third person for injuries sustained as a result of the landlord's failure to repair, the court saying, 132 N.E.2d l. c. 876:

"In the case before us, however, there is much more than such a covenant [to repair]. Not only by the lease which it made with the tenant, but by the practice and procedure actually followed, defendant landlord kept and retained a general supervision over the premises. Besides agreeing to repair upon notice, defendant reserved 'the right at any time' to go upon the demised property, inspect it and 'make such repairs and alterations as it shall deem necessary for [its] safety and preservation.' The large degree of control which this provision reflects is further accentuated both by the fact that the tenant had neither the right nor the duty to repair the premises and by the fact that the landlord had its own watchmen to guard and police them, as well as its own superintendent of maintenance and a crew of 20 men to inspect them, spot the defects and make needed repairs."

In Puleo v. Rua, N.Y.Sup., 141 N.Y.S.2d 156, 158, a similar ruling was made in a similar factual situation, as follows:

"The proof further establishes that the defendants, by the original lease, had reserved unto themselves a right of entry at any time during the term for the purposes of inspection, repairs and to send workmen in for the making of repairs. * * * While the reservation of the right in the landlord to enter and make repairs may not of itself be sufficient proof to establish control of the premises or impose a liability in tort to the tenant, I am satisfied upon the proof adduced that defendants had on occasions actually made some repairs. These facts, coupled with the reservation of entry to repair and the evidence as here disclosed, are sufficient for the finding that defendants were obligated to make the required repairs to the banister and handrail of which complaint is here made. That defendants had sufficient and adequate notice of such condition is adequately established. Moreover, the defendant Frank Rua admitted that a day or so after the accident he entered the premises, removed the remnants of the old rail and constructed a completely new handrail and banister of new lumber supplied at defendants' own expense; that he asked no permission of the plaintiffs to do so but that defendants acted on their own initiative; that plaintiffs were not even present when the repair was made. I am persuaded that such conduct on the part of the defendants indicated such conduct on the part of a landlord as indicates the reservation of the right to make repairs at his own discretion with leave of the tenant, and evidenced such a degree of control and reservation over the premises on the part of the landlords as imposes on them the obligation and duty of maintaining the premises in a safe condition and making the required repairs."

In Crowe v. Bixby, 237 Mass. 249, 129 N.E. 433, the landlord agreed "to keep the place in repair and safe to live in." Repairs were actually made inside and outside the building, and in the cellar. The court held that under the evidence the jury could have found that under the contract "the

defendant retained such possession and control of the premises as was necessary to make the needed repairs," and that "he was bound to keep them in a reasonably safe condition to the same extent as he was obligated to do so in the case of those parts of the building used in common by the tenants."

Our conclusion is that under the law defendants had a duty to maintain the porch in a reasonably safe condition for the use intended.

Defendants contend, however, that there was no duty on their part to replace the missing upright corner baluster in the porch railing; that neither of them had actual notice of the slightly different spacing between the column post and the first baluster and the spacing between the other balusters, and that neither can be charged with constructive notice.

■ Whether maintenance of the porch with a 6½ to 7-inch space between baluster and column constituted maintenance in a reasonably safe condition for the use intended was a question for the jury. On the question of notice, it was plaintiffs' burden to show that defendants had notice, actual or constructive, of the alleged defect in the porch. Peterson v. Brune, supra, 273 S.W.2d, 1. c. 282 [5]. There is no evidence that Dan Gould or his wife had actual knowledge of the wider spacing, "but in fixing [their] liability [they are] to be charged, not alone with what [they] actually knew, but also with what [they] might have known by the exercise of due diligence on [their] part to have inspected the railing in the observance of [their] duty of keeping it in a reasonably safe condition for the use and purposes for which control over the porch had been reserved in [themselves] as landlord[s]." Buchanan v. Wolff, Mo. App., 105 S.W.2d 26, 1. c. 29, 30 [6]. See also Udden v. O'Reilly, 180 Mo. 650, 79 S.W. 691, and Miller v. Geeser, 193 Mo. App. 1, 180 S.W. 3, 7, wherein it was aptly said: "Either actual knowledge of the defective condition of the railing, or such knowledge as the law implies by the facts and circumstances in the case, is sufficient to charge the landlord; it is not essential that he have actual knowledge."

■ There was sufficient evidence from which a jury could find that Dan Gould (and therefore Ida Gould) had constructive knowledge of the condition. In 1956, after the Goulds acquired the property, Dan Gould contracted with United Construction Company to remodel the porch. The contractor removed the baluster nearest the column and failed to replace it, or half of it, so as to preserve the same distance between baluster and new square post as existed between the other balusters. They left a space 5 inches wide at top and bottom instead of the 3-inch width between the others, and 6 to 7½ inches wide at the widest point, instead of the 5-inch width between the others. The increased space thus left was wide enough to enable a small child to pass through. The space where the baluster had been removed was painted over lightly. After the work was done in 1956 Dan Gould gave the porch "a quick look"; he "glanced" at it. There was no change in the balusters between 1956 and the date of injury, except for painting. Approximately one month before the accident Dan Gould and a helper installed the wire screening on the porch. In so doing they attached the bottom of the screening to the banister, which necessarily brought them face to face with the condition. From this evidence the jury could fairly infer that a reasonably careful inspection of the banister, balusters and post would have revealed the unusual and wider spacing, and in view of the object and purpose of their doing the work (installation of wire screening to make the porch safe for children) such an inspection would have suggested to any reasonable person that this space was dangerously wide and needed to be reduced. The question of notice was properly submitted to the jury.

The next question is whether defendant Dan Gould, having disposed of his title to the property and therefore no longer having a reversionary interest, was a landlord subject to liabilities as such—whether, notwithstanding his lack of title, he can be held as a landlord on the theory that he was in control of the building. The apartment building property was deeded to Ida Gould and Dan Gould in 1951, at which time they both signed a note and deed of trust thereon. Later in 1951 the Goulds transferred their title to Max Walters, Ida Gould's brother. Two years later the brother deeded it back to Ida Gould alone, not to Ida and Dan Gould jointly. Income from the property from date of purchase to date of trial was deposited in a joint bank account in the names of Ida Gould or Dan Gould or Max Walters. Money from this joint account was used to make payments on the encumbrance. Dan Gould wrote approximately 50 checks on this account relating to this property. The utility accounts (gas, water, electricity) stood in his name alone and he guaranteed their payment. Since 1953 Dan Gould and Ida Gould filed joint income tax returns reporting the income from the property as a one-half interest in the property. The returns showed Dan Gould's occupation was that of apartment house manager. Through the years Dan Gould occasionally collected the rents and gave receipts in his own name. He alone signed the contract in 1956 for the repair and remodeling of the front porches. He did all of the maintenance work on the property after 1951 (for which he was not compensated on an hourly or monthly basis). Ida Gould kept the books. Dan Gould testified that whatever interest he had in the property in April, 1951 he still had that same interest on July 7, 1964.

■ "[O]ne in possession and control of real estate may be liable for injury to a tenant through failure to make repairs, although he does not have the legal title. The view is taken that liability depends upon who has possession and control, rather than upon mere ownership." 32 Am.Jur. Landlord and Tenant, § 649. In Lindsey v. Leighton, 150 Mass. 285, 22 N.E. 901, the title to the premises was in defendant's wife, but defendant assumed to be the owner and conducted himself as such, both before and after the accident, and as such contracted with plaintiff, a tenant. The court held that it was a question of fact whether the relation of landlord and tenant existed between the parties; that the actual ownership of the premises is only one element for consideration in determining this question; that one may be a landlord who is not an owner, and that a landlord cannot escape his obligations by showing that he has no legal title. From the evidence of defendant Dan Gould's knowledge of the property, his close identity with its management, his legal possession and general control of the building, and his acting like a landlord, it may fairly be said that he assumed the duties and responsibilities of a landlord. A jury could find that he was in fact a landlord. In such case it is no defense that he has no legal title. In addition to the authorities cited above see Annotation "Liability of one exercising the rights of an owner of realty for injuries due to its condition, as affected by want of legal title," 130 A.L.R. 1525 and Taylor v. New Jersey Highway Authority, 22 N.J. 454, 126 A.2d 313, 62 A.L.R.2d 1211.

The other question is whether there was substantial medical evidence that Michael's mental condition after the injury was caused or aggravated by the fall. Defendants claim that Michael was mentally retarded before the fall; that there was no substantial evidence of aggravation of that preexisting condition, and that the evidence did not "rule out the fact that the present mental condition was not the natural development of the prior retardation."

■ This point is not well taken. Considering the evidence in the light most favorable to plaintiffs a jury could find

these facts: Although at age 3 years 10 months he had not developed normally, was a "slow developer," had "developmental retardation" and his speech development had been delayed, he nevertheless was slowly progressing. There was a good possibility that but for the accident he eventually would have reached a normal level of development, perhaps slower and later than normally to be expected, but he would have continued to progress. Before the accident he did not have "spells" or epileptic seizures and was not suffering from any brain damage. In the fall he received a broken leg, a broken mandible, a badly contused eye, and a skull fracture at the base of the brain * * * a very severe head injury. There was bleeding in the middle ear and in his nostrils. He was unconscious for 40 hours. The tissue of the brain was bruised. Severe scarring occurred in the healing process, of the kind that prevents the development of the brain and results in regression, actual loss of developmental functions, and the arrest of emotional development.

After the fall Michael was a severely retarded, epileptic child. A few months later he developed almost daily spells in which he would appear to be in a daze and would move in one direction and then another. His history and electroencephalogram tests indicated epilepsy. Two doctors were of the opinion that he had epilepsy. He was under medical treatment for that disease. He regressed. At age 5 the child was actually below his developmental level at age 3. A competent neurologist gave his opinion that based upon reasonable medical certainty the "present state of severe mental retardation unequivocally is related to the severe head injury that he sustained in 1964"; that this condition is permanent, that no improvement could be expected, and he recommended institutional care. Another medical doctor, a psychiatrist, who examined and tested Michael after the injury gave a diagnosis of organic brain syndrome, organic brain damage with posttraumatic epilepsy. He

described it as damage to the structure of the brain because of direct injury to the tissues of the brain itself, with scar tissue resulting from bleeding or tissue destruction, which can produce discharges of electrical activity in the brain which will bring about behavior disorders, unconsciousness or convulsions. It was his opinion "to a reasonable medical certainty that this—these conditions are the result of this injury * * * this fall." It was his opinion that there would be no regeneration of the destroyed brain; that work or employment is an impossibility for Michael and that he is so severely incapacitated that he needs institutional care. His prognosis is very grave. He will not get better. It is quite possible that he will get worse.

There was sufficient substantial evidence to submit to the jury the question whether Michael sustained brain damage and epilepsy as a result of the fall. Conlon v. Roeder, Mo.Sup., 418 S.W.2d 152 [2]; Waterous v. Columbian Nat. Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456, 459[3]; Dolan v. D. A. Lubricant Co., Mo.App., 416 S.W.2d 40, 43–44.

Defendants seize upon excerpts from the neurologist's testimony in which he said there was a "good possibility" that but for the accident Michael would have reached a normal level of development but that "[o]bviously [he could not] be certain because no one can," and this final question and answer at the end of his examination: "Q. In fact, this condition could have developed whether the boy fell off the porch or not? A. It could because anything can happen." On this basis they contend that this case falls within the statement in Kimmie v. Terminal R.R. Ass'n, 334 Mo. 596, 66 S.W.2d 561, that assurance of possibility is not sufficient to make a submissible case upon the issue of cause and effect; and contend that the expert's opinion must have probative support to rise above speculation and conjecture, Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, 853, and that the

evidence left the jury to speculate upon which of two possible causes was responsible for Michael's postfall condition, citing Soso v. Atlas Powder Co., C.A. 8, 238 F.2d 388, 393–394.

The neurologist's substantial evidence on causation heretofore outlined was not rendered self-destructive by these excerpts from his testimony. He testified to more than an assurance of possibility. He gave his opinion based on reasonable medical certainty. Absolute certainty is not required. Kimmie and Gaddy are not helpful for the same reasons given in the analysis of those cases in Schaefer v. Rechter, Mo.Sup., 290 S.W.2d 118, 123. Soso is not in point because there the evidence showed only that the two hypotheses were *scientifically possible*. In addition to the neurologist's testimony there was the positive testimony of the psychiatrist on causation based on *reasonable medical certainty*. The psychiatrist's testimony alone would have been sufficient to make a submissible case on causation. We are satisfied that sufficient causal connection was shown to justify the submission of epilepsy and mental retardation as elements of damage.

During voir dire examination venireman Smith, under interrogation by counsel for plaintiffs, stated that his son had been in a car accident "and the insurance company is being sued but it hasn't yet come to trial." Plaintiffs' counsel then asked this question: "So he is a defendant in his case like Mr. and Mrs. Gould are in this case, is that correct?," to which Smith answered "Yes, sir." Defendants moved to discharge the panel on the ground that counsel's question equated the status of the Goulds with that of Smith's son. The judge did not so take the meaning of counsel's question and denied the motion. Defendants contend that the remark was made in bad faith "because plaintiffs' attorney knew that any insurance coverage was limited to $10,000, or one thirty-fifth of the amount plaintiffs sued for"; that

this was an endeavor to inject prejudicial matters into the trial; that to the panel the remark could only mean that these defendants had only a nominal interest at stake and were fully protected by insurance, and that its purpose and effect were to divert the issues from that of fault to considerations of comparative wealth.

While the question as framed was unfortunate we find no inherently prejudicial vice in it. Defendants did not claim prejudice at the time. The court did not draw the inference drawn by defendants' counsel. The question was one within the sound judicial discretion of the court. No manifest abuse of that discretion or probability of injury to defendants was shown.

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.