**Lois Jean MAY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 79–0680–CV–W–1.**

United States District Court, W.D. Missouri, W.D.

Oct. 5, 1983.

---

Don Hutson, Hutson, Schmidt, Hammett & Yates, Kansas City, Mo., for plaintiff.

Robert G. Ulrich, U.S. Atty., Judith M. Strong, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDERS

JOHN W. OLIVER, Senior District Judge.

### I.

This is an action maintained under the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b(j)–247b(*l*) (1976). Coordinated pretrial proceedings were conducted in the United States District Court for the District of Columbia as a part of *In re Swine Flu Immunization Product Liability Litigation,* MLD No. 330. The legislative history of that legislation and the procedures followed in connection with the Multidistrict Litigation are set forth in many of the swine flu cases, including *Overton v. United States,* 619 F.2d 1299 (8 Cir.1980), in which the Eighth Circuit reviewed the first case tried under the Act, and in *Petty v. United States,* 679 F.2d 719 (8 Cir.1982), in which the Eighth Circuit was the first court

of appeals to consider claims of liability against the United States under the Act.

█ It is therefore unnecessary for this Court to review the legislative history of the Act and the matters determined as a part of the Multidistrict Litigation other than to state that *Petty* makes clear that "as under the Federal Tort Claims Act, liability under the Swine Flu Act depends on the law of the place where the act or omission occurred." 679 F.2d at 727.

As the plaintiff in *Petty,* the plaintiff in this case asserts multiple theories of liability. Plaintiff's trial brief contains a lengthy theoretical discussion of defendant's liability under the Federal Tort Claims Act for (1) negligence involving an alleged breach of duty to warn; (2) alleged breaches of statutory duties imposed by the Missouri and Federal Food, Drug and Cosmetic Acts; (3) negligence in implementing the swine flu program on October 1, 1976; and (4) negligence relating to the nature of the manufacture and testing of the swine flu vaccine. Plaintiff's trial brief contended that defendant should be held liable under the Swine Flu Act alone for an alleged breach of the duty to warn imposed by 42 U.S.C. § 247b(j)(1)(F), on a theory substantially the same as that rejected by the Court of Appeals in *Petty.* Plaintiff's trial brief also contended that defendant should be held liable under Missouri law because of the alleged negligence of program participants (1) for implementing the program; (2) for failing to obtain plaintiff's informed consent; (3) for failing to properly advise plaintiff of the risks and benefits of the vaccine; and (4) for negligence in manufacturing and testing the vaccine. Plaintiff's trial brief further contended that liability should be imposed under the theory of strict liability stated in § 402(a) *Restatement Second of Torts,* which has been adopted as the law of Missouri and also for alleged breaches of express and implied warranties.

Plaintiff's trial brief concluded with the statement that the defendant should be held liable because "it is clear that Lois May, in good health prior to October 26, 1976, was induced to receive an unnecessary

swine flu shot, suffered a severe adverse reaction as a result, sustained permanent after-effects, including health impairment, loss of ability to work and impairment of the quality of her life."

The first section of the defendant's pretrial brief was properly devoted to the factual issue of causation. Although defendant stated that the "issue of causation is itself dispositive in this case" (see page 15 of defendant's pretrial brief), the defendant went on to say that "at the same time, however, the evidence will show that plaintiff cannot establish any negligence on the part of the United States or any liability on the part of any 'program participant' in the Swine Flu Program."

For reasons that have never been apparent, both parties' massive pretrial proposed findings of fact and pretrial proposed conclusions of law covered all of the broad claims discussed in plaintiff's pretrial trial brief. The same thing was true of the parties' post-trial proposed findings of fact and proposed conclusions of law. In spite of the Court's post-trial effort to get the parties to file post-trial findings of fact and post-trial conclusions of law which would address the issues actually litigated at trial, and in spite of the excellent stipulation of facts agreed to by the parties and filed the day before the trial commenced, plaintiff's post-trial proposed findings of fact contained 72 separate paragraphs and the defendant's post-trial proposed findings of fact contained 113 separate paragraphs which incorporated by reference all of the 214 paragraphs of defendant's pretrial proposed findings of fact.

As will be apparent from our later discussion, the trial of this case was understandably complicated by plaintiff's shift of factual theory on the eve of trial. Up until that time, plaintiff had proceeded on the factual theory that she suffered from the Guillain-Barre syndrome which she claimed had been caused by the swine flu vaccine she admittedly received on October 26, 1976. It was not until shortly before the trial of this case commenced that plaintiff conceded that the many "medical doctors who have examined me have not been able to confirm that I had the Guillain-Barre Syndrome."

It is thus apparent that plaintiff's shift of factual theory on the eve of trial thrust the always critical factual issue of causation into even sharper focus. For it is clear that whether plaintiff, in fact, suffered from Guillain-Barre syndrome or whether she may have suffered from something other than that disease, the burden of proving the essential element of causation by the greater weight of the credible evidence rested on the plaintiff and that a failure to carry that burden of proof would necessarily require the entry of a judgment in favor of the defendant.

*Desmond (now Landon) v. United States,* No. 78–0512–CV–W–4 (W.D.Mo.1982), recently tried in this district, illustrates the proposition that the defendant's admission that the swine flu vaccine may be the cause of Guillain-Barre syndrome in particular cases does not in anyway relieve a particular plaintiff who admittedly suffered from that disease from the burden of proving that the inoculation of swine flu vaccine did, in fact, cause that plaintiff's injury. Chief Judge Clark of this Court noted in his memorandum and order granting judgment for the defendant in *Desmond (now Landon)* that "the government agreed that plaintiff contracted GBS some time subsequent to her swine flu inoculation on November 2, 1976." Accordingly, Chief Judge Clark properly stated that "the only issue in this action is whether the GBS plaintiff suffered was proximately caused by the swine flu vaccination." *See also Lima v. United States,* 508 F.Supp. 897 (D.Colo. 1981), aff'd. per curiam, 708 F.2d 502 (10th Cir.1983), for an example of another swine flu case in which the parties agreed that the "malady suffered by the plaintiff on March, 1977 was GBS." Judge Finesilver accordingly stated that "[T]herefore, plaintiff needs only to establish a causal connection between the vaccination and his GBS in order to recover damages." 508 F.Supp. at 899. In its affirmance of the district court's judgment for the defendant, the Tenth Circuit noted that in light of the fact

that "the government stipulated that plaintiff had GBS," that "[t]hus, the only issue to be tried is whether the swine flu vaccine caused plaintiff's GBS." 708 F.2d at 504.

■ It is thus clear that in the swine flu cases in which the defendant is willing to stipulate that a particular plaintiff, in fact, suffered from Guillain-Barre syndrome, that plaintiff still has the burden of proving that the swine flu shot caused plaintiff's admitted disease. Plaintiff in that type of stipulated swine flu case is simply relieved of the burden of proving any of the other elements of whatever cause of action plaintiff may have under the State law applicable to the particular case.

It is thus apparent that in swine flu cases, such as this case, in which it has not been agreed that the plaintiff, in fact, suffered from Guillain-Barre syndrome, plaintiffs, under the applicable law of most States, have the burden of proving all elements of plaintiffs' cause of action, including but not limited to the critical issue of causation.

In *Petty v. United States, supra,* the Court of Appeals for the Eighth Circuit, in footnote 7, page 726 of 679 F.2d, collected a number of the cases in which "claims under the Swine Flu Act that were consolidated in the Multidistrict Litigation" had been tried. *See* also the cases collected by Judge Finesilver in footnote 2, page 705 of 533 F.Supp. [703], reporting his decision in *Unthank v. United States.*

The swine flu cases collected in the footnotes of both *Petty* and *Unthank* show that the vast majority of those cases, regardless of whether or not the defendant may have stipulated that the plaintiff suffered from Guillain-Barre syndrome, turned on the factual issue of causation. Indeed, many of those cases recognized that a determination that the particular plaintiff has failed to carry the burden of proof on the critical issue of causation rendered discussion of any other factual or legal questions redundant. *See,* for example, *Ary v. United States,* No. 79–273–C (E.D.Okl.1981) ("since we are of the view that plaintiff has failed to prove that the vaccine caused Mrs. Ary

to suffer any injury, we will not address the issues of the government's negligence or whether plaintiff rendered an informed consent to the inoculation"); *Shores v. United States,* No. 78–X–0280–S (N.D.Ala. 1981) ("a finding of no causal relationship between the shot and plaintiff's condition is dispositive and there is no need to address other aspects of liability"); *MacEwen v. United States,* No. 79–1–E (M.D.Ala.1981) ("the Court is unable to hold that her condition was caused by the administration of the swine flu vaccine ... the Court need not consider whether there was a duty to warn of the possibility of the swine flu shot causing a polyneuropathy"); and *Stephens v. United States,* No. 80–G–0100–W (N.D. Ala.1981) ("because a finding of no causal relationships between the shot and plaintiff's condition is dispositive, the Court need not reach other aspects of liability").

Although counsel have expended an extensive amount of time and effort on any number of questions other than the critical issue of causation, we do not believe any useful purpose would be served by discussion of any issue other than that of causation. For, as the cases cited point out, a determination of that question in favor of the defendant renders all other questions moot.

It should further be noted as a preliminary matter that defendant filed a Rule 41(b), Fed.R.Civ.P., motion to dismiss simultaneously with defendant's filing of its final 68 page post-trial brief. That motion, as our discussion in the next part of this memorandum opinion will demonstrate, presents a substantial question under applicable Missouri law.

We are satisfied, however, that after all of the time and effort the parties have devoted to this case, we should consider all of the evidence adduced on the critical issue of causation, resolve all conflicts that may be presented by the evidence adduced at trial, and thus base our determination of the case on our full consideration of the merits of the case. Our ultimate conclusion that the plaintiff failed to carry the burden

of proving causation obviously renders defendant's Rule 41(b) motion moot.

We believe, however, that defendant's Rule 41(b) motion should be discussed in some detail for the reason that such a discussion will establish the importance the courts of Missouri attach to the necessity that a physician's expert testimony be based on reasonable medical certainty rather than a mere scientific possibility.

Our discussion of the trial testimony of Dr. Theel, plaintiff's treating physician, in part IV B, *infra,* establishes that a substantial question of law is presented in regard to whether Dr. Theel's testimony can be said to establish even a submissible case on the critical issue of causation.

## II.

Defendant's suggestions in support of its Rule 41(b) motion do no more than direct attention to defendant's lengthy pretrial and post-trial briefs. It is clear, however, from what is said in portions of those briefs that the defendant's motion is based on principles of law stated in the leading Missouri case of *Kimmie v. Terminal R. Ass'n. of St. Louis,* 334 Mo. 596, 66 S.W.2d 561 (Mo.1933). *Kimmie* sets forth the established Missouri rule in regard to whether a medical expert's testimony may properly be considered as substantial evidence sufficient to make a submissible case if the expert's opinion is based solely on a scientific possibility rather than a reasonable medical certainty. Defendant, of course, argues that Dr. Theel's testimony may not be considered as substantial evidence under the *Kimmie* rule.

Plaintiff has relied on only two Missouri cases to support her argument that "It is clear that under Missouri law, Plaintiff has made a submissible case on the issue of causation." (Plaintiff's post-trial brief, p. 4). Neither of those cases, *Dolan v. D.A. Lubricant Co.,* 416 S.W.2d 40 (Mo.App.1967) and *Lemm v. Gould,* 425 S.W.2d 190 (Mo. 1968), involved factual circumstances comparable to the factual circumstances presented in this case.

*Dolan* did no more than reject the defendant's claim on appeal that plaintiff's hypothetical question "assumed a fact that was not in evidence." The Kansas City Court of Appeals quoted extensively from *Harp v. Illinois Central Railroad Co.,* 370 S.W.2d 387, 391 (Mo.1963) and from *Giambelluca v. Missouri Pacific R.R. Co.,* 320 S.W.2d 457, 463 (Mo.1959) in the course of rejecting defendant's appellate claim. Both those Supreme Court of Missouri cases are progeny of *Kimmie* and both cited and relied upon that case. *Dolan* simply concluded, on the facts, that "the hypothetical question propounded to Dr. Rhoades and his answer fall within the limitations prescribed by the supreme court in the two cases just referred to."

In *Lemm,* the defendant on appeal attempted to "seize upon excerpts from the neurologist's testimony in which he said there was a 'good possibility' that but for the accident Michael would have reached a normal level of development" to support their argument that "this case falls within the statement in *Kimmie v. Terminal R.R. Ass'n.,* . . . that assurance of possibility is not sufficient to make a submissible case upon the issue of cause and effect." The *Lemm* court rejected that argument and affirmed plaintiff's judgment. That court held that:

The neurologist's substantial evidence on causation heretofore outlined was not rendered self-destructive by these excerpts from his testimony. He testified to more than an assurance of possibility. He gave his opinion based on reasonable medical certainty. . . . In addition to the neurologist's testimony there was the positive testimony of the psychiatrist on causation based on *reasonable medical certainty.* The psychiatrist's testimony alone would have been sufficient to make a submissible case on causation. (Emphasis the Court's) [425 S.W.2d at 200]

The question presented by plaintiff's argument that she "made a submissible case on the issue of causation" does not present the question of whether Dr. Theel's testimony that the swine flu vaccine was only "a

possible cause" was admissible in evidence. *Kimmie,* and all of *Kimmie*'s numerous progeny, make clear that Dr. Theel's testimony was admissible in evidence, regardless of whether his testimony was based only on a "possibility" rather than "reasonable medical certainty."

Judge Laurance M. Hyde, one of Missouri's most distinguished judges, made clear in *Kimmie* that:

> We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper. 22 C.J. 623, §§ 713, 714; 11 R.C.L. 582, § 12, p. 633, § 52; 4 Wigmore on Evidence 198, § 1976.... *Assurance of possibility is not of itself, however, sufficient to make a submissible case, upon the issue of cause and effect, for a plaintiff who has the burden of proof upon that issue.* The trouble here is that there is no more than possibility shown by either the facts or the expert testimony. (Emphasis ours) [66 S.W.2d at 565]

*De Moulin v. Kissir,* 446 S.W.2d 162, 165 (Mo.App.1969) makes clear that *Dolan* may be read only to support the proposition, consistent with the rule of *Kimmie,* that the testimony of an expert that causation may be scientifically possible is admissible in evidence. *De Moulin* stated the following:

> Here, counsel asked Dr. Hempstead if Mrs. De Moulin's dislocated jaw *was caused* by the collision. He answered that it *could* have been. That was merely an opinion that causation was scientifically possible. Such an answer is generally admissible, (*Dolan v. D.A. Lubricant Co.,* Mo.App. 416 S.W.2d 40[3–5]), but standing alone does not prove causation. (Emphasis the Court's) [446 S.W.2d at 165]

*Bertram v. Wunning,* 385 S.W.2d 803 (Mo.App.1965) was cited in *De Moulin* to support the above quoted holding. *Bertram* accurately stated the impact of *Kimmie* on the applicable law of Missouri. In *Bertram,* the defendant admitted liability. The sole issue presented to the jury therefore was the nature and extent of plaintiff's injuries. Plaintiff's treating physician, Dr. Niesen, testified on direct examination that his opinion that plaintiff had suffered a hernia as a result of the accident was "based on reasonable medical certainty." On cross-examination, however, the doctor testified that he could not "tell this jury as a medical certainty that this hernia was caused by this accident."

The trial court denied defendant's motion to disregard Dr. Niesen's testimony in regard to the causation of the hernia and also refused defendant's proffered instruction which would have advised the jury to disregard that testimony. The Missouri Court of Appeals accordingly reversed and remanded for a new trial. The *Bertram* court noted at the outset that "during the course of our judicial history our view as to what constitutes substantial evidence of cause and effect has undergone a radical change." It then stated:

> Originally it was held that a doctor's opinion that the accident "might, could or would" produce a condition found on examination was sufficient; in fact, at that time a medical expert was not permitted to express an opinion that the trauma "did" cause the injury because, it was said, such an opinion would invade the province of the jury, whose duty it was to determine that ultimate fact..... *But in O'Leary v. Scullin Steel Co.,* 303 Mo. 363, 260 S.W. 55, 61, *the Supreme Court pointed out that all that such an expert opinion amounted to was a mere possibility of cause and effect.* (emphasis ours) [385 S.W.2d at 806]

The *Bertram* court then stated the impact of *Kimmie* on Missouri's earlier rule of decision by noting that "having breached the prior rule by its holding in *O'Leary* that the causal connection between the accident and the injury might be shown by the expert's opinion that the one 'did' cause the other, the Supreme Court completed its destruction of the old rule in *Kimmie v. Terminal R.R. Ass'n. of St. Louis,* 334 Mo. 596, 66 S.W.2d 561." The *Bertram* court then stated that in *Kimmie* "the Supreme Court

held that it was not improper to ask an expert witness if something might, could, or would produce a certain result, . . . ." *Bertram* further noted, however, that in regard to the "sufficiency of such evidence," *Kimmie* had expressly held that "assurance of possibility is not of itself, however, sufficient to make a submissible case, upon the issue of cause and effect, for a plaintiff who has the burden of proof upon that issue." [385 S.W.2d at 806]

Judge Hyde, the author of *Kimmie,* later stated in *Hunt v. Armour & Co.,* 345 Mo. 677, 136 S.W.2d 312 (1939), written fifteen years after the Supreme Court of Missouri commenced its radical change in Missouri law by its decision in *O'Leary,* that "it is now settled that, in matters where the evidence does not exclude all other causes and in which no laymen could know or have any reasonable basis for an inference as to cause, opinions of doctors that a certain occurrence or condition might, could, or would produce a certain result is no more than an assurance that such a result was scientifically possible, and does not alone constitute substantial evidence that such occurrence or condition did cause it" [citing numerous Missouri cases].

The Eighth Circuit in *Ackelson v. Brown,* 264 F.2d 543, 546 (8th Cir.1958), cited *Kimmie* in a diversity case to support its conclusion that "the Supreme Court of Missouri has held that 'might or could' testimony does not make a jury issue and is not substantial evidence." *See also Commercial Union Assurance Company v. Berry,* 259 F.2d 510, 517 (8th Cir.1966), in which the Eighth Circuit recognized the existence of what is known among Missouri trial lawyers and judges as the "Kimmie Rule." In *Berry,* the Eighth Circuit quoted extensively from *Kimmie,* but concluded that the rule should not be applied under the particular factual circumstances presented in that case.

Plaintiff concedes in this case that "temporal association with an event is not in and of itself proof of causation." (Page 5 of plaintiff's post-trial brief). That concession, of course, was prompted by what has been decided in a substantial number of other swine flu cases. *See Bean v. United States,* 533 F.Supp. 567 (D.Colo.1980) ("the critical question presented in these cases is the causal relationship between the immunization and claimed illness. However, mere temporal relation between the onset of a disease and the vaccination is insufficient to establish legal causation.") Similar conclusions are stated in *Cikins v. United States,* No. 78–328–A (E.D.Va.1980); *Weldy v. United States,* No. H78–0155(C) (S.D. Miss.1981); *Baker v. United States,* No. 78–C–468 (E.D.Wisc.1981); *Peoples v. United States,* No. 79–X–0979–S (N.D.Ala.1981); *Edwards v. United States,* No. C–80–3243–WWS (N.D.Cal.1982); *Debuhr v. United States,* No. 80–1247 (D.Kans.1981); *Lung v. United States,* 535 F.Supp. 100 (E.D.N.Y. 1982); and *Mantia v. United States,* No. 79–1150 (W.D.Pa.1982).[1]

Plaintiff argues, however, without the citation of any supporting Missouri legal authority, that proof of "temporal association . . . along with the expert testimony of Dr. Theel, establishes that Mrs. May's physical problems and complaints were in fact caused by the swine flu shot." (*Id.*) While we are satisfied that the two Missouri cases relied on by plaintiff, *Dolan* and *Lemm,* do not support plaintiff's initial argument that plaintiff "made a submissible case on the issue of causation" (page 4 of plaintiff's post-trial brief), we will assume for the reason we have stated above that the causation evidence adduced by plaintiff was sufficient under the *Kimmie* rule to make a submissible case on the critical issue of causation.

We will therefore discuss all of the evidence adduced by both the parties in our consideration of whether plaintiff carried the burden of proving, as plaintiff concedes she must, that her physical problems and

---

1. See also *Hasler v. United States,* 718 F.2d 202 (6th Cir.1983) in which the Sixth Circuit concluded that "Without more, (evidence establishing a) proximate temporal relationship will not support a finding of causation."

complaints were in fact caused by the swine flu shot.

## III.

A substantial number of facts were stipulated by the parties. In addition to their agreement that the multidistrict stipulation of 232 facts, found at Exhibit 4 of the Final Pretrial Order in the United States District Court for the District of Columbia should be incorporated as a part of their stipulation of facts in this case, the parties further stipulated as to the following facts specifically applicable to this case:

1. Lois Jean May was born November 1, 1932 in Fulton County, Ohio.

2. Mrs. May received her Masters Degree in education from Central Missouri State University in 1973.

3. Except for maternity leave, Mrs. May has worked all of her married life.

4. In July, 1976, Mrs. May was hospitalized.

5. On October 26, 1976 and thereafter, Lois May and Ronald May were husband and wife, living at 620 West Charles Avenue, Independence, Missouri, in the Western District of Missouri.

6. On October 26, 1976, plaintiff Lois May was a school teacher employed by the Kansas City, Missouri Public School District.

7. On October 26, 1976, plaintiff Lois May received a swine flu vaccination pursuant to the National Influenza Immunization Program, at Van Horn High School, 1109 South Arlington, Independence, Jackson County, Missouri.

8. Mrs. May obtained a form at the Mt. Washington School where she taught; she read it, signed it and brought it with her to Van Horn High School.

9. At Van Horn High School, the word "MONO" was written over the bivalent registration/consent form which Mrs. May had already signed and she received the monovalent swine flu shot by jet gun.

10. Plaintiff Lois May was provided the swine flu vaccination without charge for such vaccine or its administration.

11. In December of 1976, Mrs. May and her family drove to Ohio on business and family matters.

12. Plaintiff Lois May was admitted to Trinity Lutheran Hospital, 31st and Wyandotte, Kansas City, Missouri on January 4, 1977 and discharged on January 9, 1977. Lois May went to the Trinity Emergency Room on February 27, 1977 and was released that same day.

13. Plaintiff Lois May was admitted to the University of Kansas Medical Center, Rainbow Boulevard at 39th, Kansas City, Kansas on May 26, 1977, discharged May 27, 1977, readmitted on May 31, 1977 and discharged on June 2, 1977.

14. Mrs. May took accumulated sick leave days from her employment on November 8 through 19, 1976, January 4 through 12, 1977, and January 17 through February 15, 1977.

15. Mrs. May took a leave of absence from her employment and was off payroll from February 14, 1977 until the end of the 1976–1977 school year.

16. The defendant in this action is the United States of America.

17. Mrs. May returned to her employment with the Kansas City, Missouri Public School District in the fall of 1977.

18. In August, 1978, Mrs. May moved to Star Route 2, Box 61A, Viola, Arkansas, and is currently residing there.

19. Plaintiff Lois May submitted an administrative claim to Mr. Arthur Simon, Director, Division of Public Health Service Claims received on October 11, 1978 and on June 22, 1979 plaintiff Lois May's claim was officially denied.

20. Mrs. May was employed full-time as a special education teacher by the Board of Education, Salem, Arkansas, for the school year 1978–1979.

21. Mrs. May is currently employed full-time as an elementary school teacher by the

Board of Education, Viola, Arkansas, and has been so employed since the fall of 1979.

22. The swine flu vaccine received by Mrs. May was manufactured by Merrell National Laboratories.

23. The swine flu vaccine received by Mrs. May had not been altered or changed in any way from the time of its manufacture to the time of her inoculation.

24. The Kansas City, Missouri, Health Department established a program to give swine flu shots in the Kansas City area and Lois May received a shot under that program so established.

Recitation of the 232 facts stipulated in the multidistrict litigation would not serve any useful purpose. We turn now to the evidence adduced on the critical issue of causation and to the findings of fact proposed by the parties in connection with that evidence.

### IV.

#### A.

Paragraph 8 of plaintiff's pretrial proposed findings of fact requested that this Court find: "That due to the injuries sustained by Lois May as a result of the swine flu shot, she was caused to seek medical care and attention from the following physicians: Dr. Otto Theel, M.D., Dr. Edward Novak, M.D., Dr. Jeanne E. Reiss, M.D., Dr. James W. Newmann, M.D., Dr. William Woodward, M.D., Dr. Dewey K. Ziegler, M.D., Dr. Arthur Dick, M.D., Dr. Phillip Anton Singer, M.D., Dr. Barry W. Festoff, M.D., and Dr. Bernard M. Abrams, M.D."

The medical records of all of plaintiff's physicians and the medical records of Dr. Violet Matovich, who was called as a live medical witness by the defendant, are included in the parties' 226 page Joint Exhibit No. 1 ("J. Exh. No. 1"). Plaintiff called Dr. Theel as her only live medical witness. The parties stipulated that depositions of all the remaining physicians, with the exception of Dr. Abrams, should be admitted in evidence in lieu of their live testimony at trial.

Although it is conceded in plaintiff's final post-trial brief that the question of causation is a major issue in this case, only three of plaintiff's final seventy-two post-trial proposed findings of fact related to the essential issue of causation. Those three post-trial amended proposed findings of fact stated the following:

18. That prior to October 26, 1976, Lois May was in good health.

19. That following the flu shot, Lois May suffered pain and weakness in her legs, arms and chest, difficulty in breathing, difficulty in swallowing, inability to stand for any length of time, inability to maintain arms elevated and inability to engage in recreational activities such as swimming, playing ball, singing and gardening.

20. That Lois May suffered a severe adverse reaction with both organic injury and functional manifestations as a result of the swine flu shot.

Paragraphs 18 and 19 of plaintiff's post-trial proposed findings of fact, if supported by the weight of the evidence, would establish no more than a somewhat indefinite temporal association between plaintiff's swine flu vaccination on October 26, 1976 and the commencement of her problems. Establishment of even a definitive temporal association would not, as demonstrated by the swine flu cases to which we have made reference above, be sufficient evidence to establish causation. Indeed, plaintiff concedes that the establishment of a temporal association must be considered only "along with the expert testimony of Dr. Otto Theel" in order for plaintiff to establish that her "physical problems and complaints were in fact caused by the swine flu shot." (Plaintiff's post-trial brief, p. 5). It is thus apparent that plaintiff's key proposed finding of fact is that stated in paragraph 20 of plaintiff's post-trial proposed findings of fact. Plaintiff seeks to support that key proposed finding of fact by the citation of only three pages of the trial testimony of Dr. Theel; two pages of the deposition testimony of Dr. Festoff; and by the citation of a note made by Dr. Festoff on a Univer-

sity of Kansas Medical Center hospital record in June of 1977.

As noted above, consideration of the medical evidence with regard to the issue of causation must be made in light of the fact that until January 11, 1983, a time shortly before trial, plaintiff was proceeding on the factual theory that a definite diagnosis of Guillain-Barre syndrome had been made with respect to the plaintiff during the time she was a patient of the University of Kansas Medical Center in May, 1977. Dr. Theel had so stated in a letter to plaintiff's counsel dated August 17, 1978 (J. Exh. No. 1, p. 58).

On January 11, 1983, however, plaintiff filed a supplemental answer to defendant's interrogatories which stated the following:

At the time of answering the government's interrogatories and request for admissions, I still believed that I had contracted the Guillain-Barre Syndrome as a result of the swine flu vaccination. This opinion was based upon conversations my attorneys and I originally had with my doctor, Otto Theel, M.D.

However, I now believe that the medical doctors who have examined me have not been able to medically confirm that I had the Guillain-Barre Syndrome.

Their findings and the psychological testing done in 1977 at the request of Dr. William Woodward and recent psychological testing done by Dr. Ruth Ilmer, Ph.D., have established that I had a severe adverse reaction to the swine flu shot with both organic injury and functional manifestations which caused me to have Guillain-Barre-like symptoms.

The depositions of all of plaintiff's numerous physicians were, of course, taken during the time plaintiff contended that this case was, in fact, a Guillain-Barre syndrome case and at a time before plaintiff conceded, on the eve of trial, that no physician had ever "been able to medically confirm that [she] had the Guillain-Barre Syndrome."

In spite of the fact that Dr. Theel candidly testified at trial that his August 17, 1978 letter to plaintiff's counsel had inaccurately stated that "a definite diagnosis of Guillain-Barre Syndrome had been made" at the University of Kansas Medical Center (Tr. 101), plaintiff nevertheless cited that letter as evidence in support of plaintiff's new factual theory. See page 2 of plaintiff's post-trial brief.

It is thus apparent that our discussion of Dr. Theel's testimony must include a discussion of the circumstances under which he wrote his August 17, 1978 letter to plaintiff's counsel and the circumstances under which Dr. Theel wrote an earlier letter on August 16, 1977, in which he stated that "Mrs. May has recovered from the flu syndrome—Guillain-Barre" (Tr. 129; J. Exh. No. 1, p. 61).

We turn now to plaintiff's medical evidence as it relates to the issue of causation.

### B.

Dr. Theel, who conducts a family or general practice, has been plaintiff's physician since 1966. Following plaintiff's swine flu shot on October 26, 1976, plaintiff saw Dr. Theel on November 2, 1976, complaining of "a sore throat and chest congestion" (Tr. 89); on November 5, 1976, complaining about a "sore throat and headache" (Tr. 89); on November 8, 1976, complaining of a "cough, weakness, headache, loose stools, and frequent stools" (Tr. 90); on November 12, 1976, complaining of "pain in her left shoulder and arm, chest soreness, weakness, lots of gas" (Tr. 90); and on November 17, 1976, complaining that "she just felt terrible, everything seemed to be wrong" (Tr. 90).

It is undisputed that a moratorium was called in the national Swine Flu Program on December 16, 1976 (M.L.D. Stipulation No. 277). Dr. Theel testified that he saw plaintiff two days later on December 18, 1976, at which time she was complaining about "the loss of use of her left arm" and that plaintiff had told him that "this had been true since the 26th of October, at which time she had received a swine flu shot at her school" (Tr. 90).

As will be apparent from Dr. Theel's admission memorandum to Trinity Lutheran Hospital, which will presently be quoted, Dr. Theel made reference in that memorandum to plaintiff's December 18, 1976 visit to his office by stating that plaintiff "was seen shortly before the Christmas Holidays, about the time the news came out regarding the Guillain-Barre syndrome, following the swine flu shots." Dr. Theel testified, and his testimony is corroborated by his office records, that he had not "recorded any complaint of arm or leg problems prior to the time in December when Mrs. May complained of her left arm or loss of use of her left arm following the Swine Flu shot on October 26th" (Tr. 126).

Dr. Theel next saw the plaintiff on January 3, 1977, at which time she was complaining of "shortness of breath, pain in her chest, and her arm weak. She was upset and very nervous" (Tr. 90–91). Dr. Theel recommended that plaintiff be admitted to Trinity Lutheran Hospital (Tr. 91). Plaintiff was admitted the next day. Dr. Theel personally dictated plaintiff's admission memorandum (Tr. 92), which stated in part the following:

This 44-year old white female, schoolteacher by profession, began to have difficulty with breathing and coughing approximately six weeks ago. This had followed a swine flu shot, and the patient at the time of receiving the shot, thought that she had unusual soreness in her arm, but had no swelling and no difficulty with the arm at the time. But then she began to experience difficulty with breathing, becoming short of breath on exertion. She thought she run some temperature and took aspirin for this. The condition did not heal with this treatment and she was seen in the office.... She was seen shortly before the Christmas Holidays, about the time the news come out regarding the Guillain-Barre syndrome, following the swine flu shots, complaining then that she had numbness in her left arm, and soreness in the upper part of the arm and could not move the arm too well, but yet while talking with me and demonstrating she was able to move the arm above the shoulder, and as far as we could see, had no impairment of the use of the arm in any way, but also by this time she complained bitterly of the fact that she was short of breath, and was coughing more and had more difficulty.... She has returned and now complains that she is still short of breath, that she cannot teach her class at school, any exertion causes shortness of breath, even eating her food causes difficulty, so she is being admitted to the hospital for more definite evaluation.

Under the "review of systems" portion of Dr. Theel's admission memorandum, he stated:

NEUROPSYCHIATRIC: The patient is a fairly apprehensive individual, and gets fairly emotionally involved when she is ill.

Dr. Theel testified on direct examination that plaintiff was admitted to the hospital because "we were attempting to make a diagnosis" (Tr. 93) but that "we were not able to make a definite diagnosis" before plaintiff's discharge from the hospital on January 9, 1977 (Tr. 93–94). Accordingly, when Dr. Theel saw plaintiff again on January 21, 1977, at which time plaintiff's complaints were the same as when he last saw her, he referred plaintiff to Dr. James W. Neumann and Dr. Edward J. Novak (Tr. 94). Dr. Theel testified that neither of those doctors were "able to make a definitive diagnosis" (Tr. 94).

Dr. Theel's office records show that when he saw the plaintiff on February 2, 1977 she "still complains the same" (J. Exh. No. 1, p. 63) and that when he saw her on February 18, 1977 plaintiff complained of "sore throat, conjested—had flu last week" (J. Exh. No. 1, p. 62). On the latter day, Dr. Theel wrote a "To Whom It May Concern" letter dated February 18, 1977, in which he stated that "Mrs. May is suffering from extreme weakness in the left arm and left shoulder, following a swine flu vaccination. We feel that she is unable to work at this time" (J. Exh. No. 1, p. 60). It may be inferred that Dr. Theel wrote that letter at

plaintiff's request to support her requested leave of absence from her employment by the Kansas City School District from February 14, 1977 until the end of the 1976–1977 school year. When Dr. Theel saw plaintiff again on February 28, 1977, she complained of "headache, sore throat, upset stomach" (Tr. 95).

Although plaintiff became a patient of Dr. Woodward on March 10, 1977, she visited Dr. Theel again on April 13, 1977, complaining about "headaches" and still again on May 4, 1977, complaining about "soreness below rib cage—not sharp, not related to movement" (J. Exh. No. 1, p. 62).

Those visits to Dr. Theel were after plaintiff had authorized Dr. Woodward on March 10, 1977 to send Dr. Theel the results of his examination of plaintiff (J. Exh. No. 1, p. 63). As will be later noted in detail, Dr. Woodward, aided by numerous studies made by other physicians, was never able to make any medical finding of any physical impairment or to develop any idea in regard to what might have been the matter with plaintiff.

Dr. Theel's office records show that plaintiff was again in his office on August 15, 1977 (J. Exh. No. 1, p. 62). The following day Dr. Theel wrote a long hand note which stated "Mrs. May has recovered from the flu syndrome, Guillain-Barre, and [is] able to return to the school room" (Tr. 129). Dr. Theel testified that his letter of August 16, 1977 was written at plaintiff's request so she could resume teaching in the fall (Tr. 130).

Dr. Theel testified at trial, however, that at the time he wrote that August 16, 1977 letter he was under the mistaken impression that "she had had a positive biopsy at K.U." (Tr. 131). Dr. Theel, however, never had an occasion "to look at the K.U. record . . . until it was shown to me . . . when you took my deposition" (Tr. 131). That deposition was taken on August 19, 1982. Dr. Theel testified that he learned for the first time when his deposition was taken on August 19, 1982 that what he had stated in his August 16, 1977 letter in regard to plaintiff ever having suffered from the Guillain-

Barre syndrome was not an accurate statement (Tr. 131).

Dr. Theel's office records show that plaintiff came to his office on August 14, 1978 to advise him that she was "moving to Arkansas" and that she needed a "teacher's statement of health" (J. Exh. No. 1, p. 62). Three days after that visit, Dr. Theel wrote his August 17, 1978 letter to counsel for the plaintiff. Plaintiff quotes and relies on a portion of one sentence from that letter on page 2 of plaintiff's post-trial brief to support plaintiff's causation argument. Plaintiff also cites pages 99–100 of Dr. Theel's trial testimony concerning that letter in an effort to support paragraph 20 of plaintiff's proposed findings of fact.

### C.

Dr. Theel's August 17, 1978 letter to plaintiff's counsel appears on pages 58–59 of Joint Exhibit No. 1. The first paragraph of that letter stated that:

Mrs. May was seen in our office on November 2, 1976, complaining of chest congestion and sore throat. It was felt that she was suffering from a viral infection and an infected throat and an antibiotic was prescribed. She was seen again on November 5, 1976, at which time she felt that there was some improvement, however, her throat was still sore and she now complained of severe headache. The patient was seen again on November 8, 1976, still complaining of headache, loose and frequent stools; she had developed a cough and felt extremely weak. She was advised to continue the antibiotic.

That paragraph of Dr. Theel's letter is consistent with and supported by his office records. See page 64 of Joint Exhibit No. 1. The second paragraph of Dr. Theel's August 17, 1978 letter stated that:

Mrs. May was next seen on November 12, 1976, at which time she complained of extreme weakness and pain in her left shoulder and arm. She advised that she had received a Swine-flu shot at her school on October 27, 1976 and her arm

had been red and swollen following the shot.

That paragraph did not accurately reflect Dr. Theel's office records. For it is clear that the first notation on Dr. Theel's office records concerning the plaintiff having received a swine flu shot was made on December 18, 1977, a month later than the date stated in Dr. Theel's August 17, 1977 letter. The third paragraph of the letter stated that:

On November 17, 1976, Mrs. May was seen again, stating that she felt "just terrible." She ached all over, still had a slight sore throat, was extremely weak and had been unable to work the previous week. She was seen again on December 18, 1976 at which time she stated she had lost the use of her left arm and was still very weak. At that time, it was considered that her condition might be a result of the flu shot in October. She was treated conservatively with steroids.

The next to the last sentence of that paragraph which stated that as of December 18, 1976 Dr. Theel "considered that her condition might be the result of the flu shot in October" may not properly be considered as substantial evidence of causation. For Dr. Theel's trial testimony and his office records establish that he simply did not know what might have been wrong with the plaintiff on December 18, 1977. Dr. Theel's use of the words, "*might* be a result of the flu shot," was, at best, nothing more than an expression of possibility, a circumstance which must, at least, be considered as going to the weight of the evidence.

The fourth paragraph of Dr. Theel's August 17, 1978 letter stated:

Mrs. May was seen again on January 3, 1977 at which time she was very nervous and upset, complaining of the same symptoms and now had pain in the left arm and chest. She was admitted to Trinity Lutheran Hospital on January 4, 1977 for a series of tests which are a matter of hospital record. No specific diagnosis was made except for Chronic Bronchitis.

That paragraph accurately reflected Dr. Theel's inability to make any diagnosis of plaintiff's condition as of January 4, 1977 and his decision that it was necessary that plaintiff be admitted to Trinity Lutheran Hospital for the series of tests that were later conducted for the purpose of attempting to make a diagnosis.

The last sentence of that paragraph, however, which stated that "No diagnosis was made except for Chronic Bronchitis," cannot be said to support an inference that a specific diagnosis of "chronic bronchitis" was in fact made after the series of tests were conducted during plaintiff's January 4 to January 9, 1977 Trinity Lutheran Hospital admission. Indeed, numerous portions of the hospital records establish that "chronic bronchitis" was merely plaintiff's "admitting diagnosis" rather than her "final diagnosis." See, for example, pages 105, 115, and 116 of Joint Exhibit No. 1.

Contrary to the statement in Dr. Theel's letter that "no specific diagnosis was made," and contrary to his direct testimony at trial, page 117 of Joint Exhibit No. 1 establishes that plaintiff's "final diagnosis" was in fact made upon plaintiff's discharge from Trinity Lutheran Hospital. That final diagnosis was "Acute anxiety." Dr. Theel's discharge summary of plaintiff from Trinity Lutheran Hospital further reflected the fact that he was of the view at the time plaintiff's discharge from the hospital she "had no difficulty with the arm at the time of the shot, but several weeks afterward when all the news came out about Guillain-Barre syndrome, she began to complain of all the symptoms."

Dr. Theel's discharge summary also made reference to Dr. Novak's consultation report and to the EMG studies that were performed while plaintiff was in the hospital. The full text of Dr. Theel's discharge summary stated that:

This 44 year old, white female was admitted with a chief complaint of difficulty in breathing, coughing and lack of use of her right arm following the flu shot. She had no difficulty with the arm at the time of the shot, but several weeks afterwards when all of the news came out about Guillain-Barre syndrome, she

began to complain of all of the symptoms but she was brought to the hospital and found to be in no acute difficulty, was seen by Dr. Novak and EMG studies showed no impairment of any type. She was told this and reassured and seeming has herself under control now and will be discharged to home care, where she will be followed as an outpatient. She does have colitis and obesity and is a very emotional individual who I think will respond well with the problem. OWT:pc

The fifth paragraph of Dr. Theel's August 17, 1978 letter stated:

At this time, Mrs. May was advised to consult with an Internist and a Neurological consultation was also advised. It was felt that the reaction from the swine flu shot caused the extreme weakness, inability to use the left arm, general malaise and fatigue.

Dr. Novak's consultation report shows that he examined plaintiff on January 7, 1977. That report stated that plaintiff complained to Dr. Novak about "left-sided weakness," rather than the "lack of use of her right arm," the complaint stated in Dr. Theel's discharge summary quoted above. Regardless, Dr. Novak's report concluded that:

Do not feel her symptoms have an organic basis. If there have been findings indicating Guillain-Barre-like disease, suggest CSF investigation and/or nerve conduction study.

Dr. Novak's deposition testimony made clear that he did not "make findings which indicated a Guillain-Barre-like disease" (Novak depo. p. 13) and that he did not consider "Guillain-Barre as a possible diagnosis" (*Id.* p. 16). Dr. Novak testified, we believe accurately, on page 16 of his deposition that he did not advise either the plaintiff or Dr. Theel that plaintiff had Guillain-Barre syndrome.

It is thus apparent that neither Dr. Novak's contemporaneous consultation report, nor his deposition testimony, nor any Trinity Lutheran Hospital record, can be said in any way to support any "feeling" on the part of Dr. Theel that plaintiff's "reaction from the swine flu shot caused the extreme weakness, inability to use the left arm, general malaise and fatigue," as stated in the last sentence in the fifth paragraph of his August 17, 1978 letter to plaintiff's counsel.

The sixth and final paragraph of Dr. Theel's letter of August 17, 1978 stated:

Mrs. May's care was in the hands of her Internist from that time and she was referred to the KU Medical Center for muscle biopsy. This was done and a definite diagnosis of Guillain Barre Syndrome was made.

As we have noted above, Dr. Theel testified at trial that he had never seen the K.U. Medical Center records at the time he wrote plaintiff's counsel on August 17, 1978. Accordingly, Dr. Theel testified at trial that what he had stated in regard to a definite diagnosis of Guillain-Barre syndrome in that and in other letters he wrote was simply inaccurate (Tr. 101 and 131).

At trial, Dr. Theel refused to give an affirmative answer to plaintiff counsel's leading question which stated in part that "you had not been told by Mrs. May that [a Guillain-Barre syndrome] diagnosis had been made [at K.U. Medical Center]" (Tr. 101). Rather, Dr. Theel answered that question by stating that: "I cannot say where I received the information" (Tr. 101). During cross-examination, Dr. Theel testified that it was "very possible" that plaintiff may have understood that somebody had so diagnosed her [as having Guillain-Barre syndrome] and had advised [him] accordingly and that [he] took her word for it" (Tr. 144).

It is not necessary that we make a finding in regard to where Dr. Theel may have received the erroneous information that "a definite diagnosis of Guillain-Barre syndrome had been made ... at K.U. Medical Center," as stated in the final paragraph of Dr. Theel's August 17, 1978 letter to plaintiff's counsel. It is, however, necessary that we make a specific finding in regard to whether we accept or reject Dr. Theel's affirmative answer to the following leading question asked him on direct examination:

Q. Now then, Doctor, directing your attention to the second page of that exhibit, page 2, there is this language: "At this time, Mrs. May was advised to consult with an internist and a neurological consultation was also advised. It was felt that the reaction from the swine flu shot caused the extreme weakness, inability to use the left arm, general malaise and fatigue." That was your opinion as of that time, correct?

A. Yes. [Tr. 100]

That question was asked after Dr. Theel had testified that all the statements he made in his August 17, 1978 letter to plaintiff's counsel were accurate except his statement in the final paragraph of that letter that "a definite diagnosis of Guillain-Barre syndrome was made" at K.U. Medical Center (Tr. 100). The introductory "At this time" language in the first sentence of the fifth paragraph of Dr. Theel's letter must obviously be read as referring to plaintiff's January, 1977 admission to Trinity Lutheran Hospital.

We are satisfied that Dr. Theel's affirmative answer to the leading question above quoted must be rejected because all of the contemporaneous evidence in the Trinity Lutheran Hospital record discussed above establishes that neither Dr. Theel, Dr. Neumann, nor Dr. Novak had any real idea about what might be wrong with plaintiff in January, 1977 other than acute anxiety. We further find that neither Dr. Theel, Dr. Neumann, Dr. Novak nor any other person made any statement concerning any "feeling" that "the reaction from swine flu shot caused the extreme weakness, inability to use the left arm, general malaise and fatigue," as stated in the second sentence quoted from the fifth paragraph of Dr. Theel's August 17, 1978 letter to plaintiff's counsel. We further find that plaintiff's attempted reliance on any portion of Dr. Theel's August 17, 1978 letter to plaintiff's counsel to support a finding of causation is untenable.

**D.**

Plaintiff's counsel also cites Dr. Theel's testimony on page 113 of the transcript to support paragraph 20 of plaintiff's post-trial proposed finding of fact. Page 113 of the transcript reflects Dr. Theel's answer to a hypothetical question asked him on direct examination. See pages 106 to 111 of the transcript.

We cannot find that Dr. Theel's answer to plaintiff's counsel's long hypothetical question supports plaintiff's proposed causation findings of fact. Rather than asking Dr. Theel to assume that plaintiff, in fact, suffered from some particular disease, Dr. Theel was simply asked vaguely to assume that "Mrs. May continued to have physical problems in 1979, 1980 and in 1981 of this same nature" (Tr. 111). He was then asked whether he had "an opinion, . . . based on a reasonable degree of medical certainty as to the cause of Mrs. May's physical problems and complaints" (Tr. 111).

Dr. Theel, as would be anticipated, testified that "I have an opinion" (Tr. 113). When asked whether he had an "opinion as to whether or not the Swine Flu shot that she received caused those physical problems and complaints" (Tr. 113), Dr. Theel testified only that "In my opinion *it is entirely possible,* yes" (Tr. 113) (emphasis ours).

On cross-examination, Dr. Theel gave the following testimony:

Q. Did you ever at any time, any place, in your records, make a notation that her problems were related to the shot?

A. You are referring to my medical record of the patient?

Q. Well, either your office visits or the records from Trinity Lutheran.

A. No, I did not. [Tr. 127]

Dr. Theel also testified on cross-examination that he would concur if "Dr. Novak was of the opinion that there was no objective signs of muscle weakness" (Tr. 132); that he would defer to Dr. Neumann's opinion if "Dr. Neumann were to determine that Mrs. May had a normal clinical, neurological evaluation" (Tr. 132); that he would

rely upon a determination by Dr. Reiss that "Mrs. May had a normal EMG" (Tr. 132–33); that he would defer to an opinion expressed by Dr. Ziegler that "Mrs. May had a normal exam and no clinical or objective findings of weakness" (Tr. 133–34); and that he would also defer to any opinion expressed by Dr. Abrams (Tr. 134).

Dr. Theel further testified on cross-examination that of all the physicians who examined the plaintiff, he had only talked with Dr. Novak and Dr. Neumann and that he had not seen the University of Kansas Medical Center records at the time he wrote his various letters which stated that plaintiff had been diagnosed as having the Guillain-Barre syndrome (Tr. 137–38). Dr. Theel also testified on cross-examination that he had never performed any objective test that showed that plaintiff had ever suffered any weakness (Tr. 143) and that at the time plaintiff was admitted to Trinity Lutheran Hospital he did not know of any "physical findings indicating pathology of any type" (Tr. 143) and that at that time "she was able to move the arm above the shoulder, and as far as we could see, had no impairment of use of the arm in any way" (Tr. 144).

Dr. Theel testified on cross-examination that he agreed with the "diagnosis of anxiety neurosis" made February 27, 1977 at Trinity Lutheran Hospital because "we made that diagnosis in January [1977]" (Tr. 152). He amplified his testimony concerning plaintiff's diagnosis of "anxiety neurosis" in the following questions and answers on cross-examination:

Q. (By Mrs. Strong) Do you think it was a valid diagnosis in February?

A. Yes.

Q. Do you think it was a valid diagnosis in January?

A. Yes.

Q. Do you think it is still a valid diagnosis?

A. I think as stated previously that a patient oftentimes worries considerably about problems that they have and this is a valid diagnosis of making a diagnosis of anxiety, yes. [Tr. 152–53]

Dr. Theel's testimony at the close of cross-examination made clear that he could not express an opinion based on reasonable medical certainty that the swine flu vaccine was the cause of plaintiff's condition. Dr. Theel's testimony was concluded with the following questions and answers:

Q. When it comes right down to the final analysis, then, isn't it a fact that you can say that the Swine Flu vaccine is only a possible cause of her wastebasket problems?

A. In my opinion, it is a possible cause, yes.

Q. Possible cause. Can you say with reasonable medical certainty that she had this wastebasket of stuff caused by the shot?

A. I cannot say with medical certainty, but it is my opinion that it could be, yes.

Q. It is your opinion that it could be?

A. Yes. [Tr. 158]

We find that neither Dr. Theel's answer to plaintiff's hypothetical question nor any of the remainder of his testimony supports plaintiff's proposed findings of fact relating to causation. We expressly reject all of Dr. Theel's causation evidence, including but not limited to what he stated in the various letters he wrote, for the reason we find that evidence to be contrary to the weight of all the other evidence in the case.

E.

The only additional evidence cited and relied upon by plaintiff other than the testimony of Dr. Theel to support plaintiff's proposed causation findings of fact is the "deposition testimony of Barry W. Festoff, M.D., at pages 9–10 and page 158 of the Joint Exhibit No. 1." It is difficult to understand how plaintiff believes that the deposition testimony of Dr. Festoff, who saw plaintiff only one time on June 30, 1977 in the neurology clinic at the University of Kansas Medical Center (Festoff dep. p. 6), and the short note he made on the Universi-

ty of Kansas Medical Center hospital record may properly be considered as substantial evidence to support factual findings of causation. For it is clear that the parties agreed upon a trial stipulation which stated the following:

The testimony of Dr. Barry Festoff would be that Mrs. May did not have Guillain-Barre Syndrome and he was unable to find any neurological problems. He is unable to form an opinion to a reasonable degree of medical certainty as to what caused Mrs. May's complaints. (Stipulation dated January 27, 1983)

Dr. Festoff's deposition testimony also established that he did not make either an admitting diagnosis or a final diagnosis of plaintiff (Festoff dep., p. 6); that "the most likely basis for my statement [in the note on the hospital record] was the resident's description to me" (*Id.,* p. 9); that he did not personally "observe any of these various signs" (*Id.* p. 9–10); that he did not "feel that she had Guillain Syndrome" (*Id,* at 12); that he did not "feel that she had evidence of neuropathy of any kind . . . or any evidence of neuropathic clinical signs" (*Id.,* p. 13); and that he did not "have an opinion as to what her diagnosis was on the 30th of June [1977]" (*Id.,* at p. 13). We accordingly find that neither Dr. Festoff's deposition testimony nor the note he made on the hospital record on June 30, 1977 support plaintiff's proposed causation findings of fact.

F.

Dr. Violet B. Matovich was called by the defendant as its only live expert medical witness. The following findings of fact are fully supported by Dr. Matovich's testimony. We expressly find Dr. Matovich's testimony to be the most credible evidence adduced by the live witnesses who testified at trial.

1. Dr. Violet Matovich, Professor of Neurology at the University of Missouri School of Medicine in Kansas City and Chief of the Section of Neurology at Truman Medical Center, testified for defendant. (Tr. 163, 1. 18–20)

2. Dr. Matovich examined Mrs. May on March 26, 1981 and felt she had an essentially normal neurological exam. (Tr. 166–72, 1. 24–26)

3. In anticipation of her trial testimony, Dr. Matovich read Joint Exhibit No. 1, the depositions of all the medical doctors, Lois May's deposition, and literature on Guillain-Barre Syndrome (Tr. 172, 1. 12–25; Tr. 173, 1. 1–25; Tr. 174, 1. 1–4).

4. It is Dr. Matovich's opinion based upon a reasonable degree of medical certainty that Lois Jean May did not have Guillain-Barre Syndrome following the swine flu shot (Tr. 174, 1. 5–18).

5. It is Dr. Matovich's opinion based upon a reasonable degree of medical certainty that plaintiff did not have any neurologic dysfunction following the injection (Tr. 174–75, 1. 19–25, 1–5).

6. It is Dr. Matovich's opinion based upon a reasonable degree of medical certainty that plaintiff did not have any organic disease following the shot or attributable to the shot (Tr. 175, 1. 6–16).

7. It is Dr. Matovich's opinion based upon a reasonable degree of medical certainty that plaintiff did not have any documented medical disorder except that she was an obese lady and had some documented intermittent hypertension (Tr. 175–76, 1. 17–25, 1–3).

8. It is Dr. Matovich's opinion based upon a reasonable degree of medical certainty that there was no evidence of any documentation that plaintiff had any type of disorder that could be attributed to the shot (Tr. 176, 1. 4–16).

9. Dr. Matovich's review of the materials she examined revealed no documentation of any objective neurologic dysfunction (Tr. 177, 1. 17–25, 1–2).

Our findings of fact in regard to our acceptance of Dr. Matovich's trial testimony, our express rejection of Dr. Theel's trial testimony, and our findings of fact in regard to the deposition testimony of the other physicians require and support our ultimate conclusion that plaintiff failed to

carry the burden of proving by a preponderance of the credible evidence that the swine flu vaccine was the cause of any type of problem or complaint that plaintiff may have suffered under the circumstances.

G.

In regard to the deposition testimony of the various physicians who examined plaintiff, we make the following additional findings of fact:

10. The deposition of James W. Neumann, M.D., neurologist, taken June 5, 1981 was admitted in evidence and Dr. Neumann's testimony therein was that Dr. Neumann examined Lois Jean May on February 3, 1977 and wrote Dr. Otto Theel, the family physician, a letter that date stating that the patient's symptoms were best explained on a functional basis, that the neurological examination was essentially within normal limits (Neumann deposition, Exhibit 3).

11. Dr. Neumann stated that Mrs. May's signs and/or symptoms indicated nothing to him. (Id., 12–13).

12. After reading Mrs. May's diary of her problems, Dr. Neumann testified he would not change his opinion. (Id. 13–14)

13. Dr. Neumann testified that he did not feel Mrs. May's symptoms were related to any previous injection of any kind. (Id. 17).

14. The deposition of Edward J. Novak, M.D. taken May 15, 1981, was admitted in evidence and Dr. Novak's testimony therein was that Dr. Novak examined Lois Jean May on January 7, 1977 and wrote on his consultation report that he did not feel her symptoms have an organic basis. (Novak deposition, Exhibit 5).

15. Dr. Novak testified that in his examination of the patient she had a perfectly delineated line down the middle of her body and everything on one side, supposedly, had less feeling and the other side was normal, which made him suspicious because there is no organic syndrome to the best of his knowledge that gives you a perfectly straight line down the middle of the body and such a perfectly delineated line usually indicates possible psychological influences. (Id. 10–11).

16. Dr. Novak observed no breathing difficulties and Mrs. May's voice had normal temper and tongue strength. (Id. 14–15).

17. Dr. Novak did not advise Mrs. May or Dr. Theel or Dr. Hamlin that she had the Guillain-Barre syndrome. (Id. 16).

18. Dr. Novak testified that his strong feeling was that she did not have any organic involvement, that a disease process was not going on in nerves or muscles. (Id. 17).

19. The deposition testimony of William W. Woodward, M.D., a specialist in internal medicine, was admitted in evidence.

20. Plaintiff was referred to Dr. Woodward by one of Dr. Woodward's patients who apparently was a friend of the plaintiff. The plaintiff was first seen by Dr. Woodward as a new patient on March 10, 1977, and was later seen by Dr. Woodward on April 7, April 19, and May 2, 1977. Dr. Woodward's records showed that there were several telephone calls with the plaintiff interspersed between those dates.

21. Dr. Woodward reviewed all of the multiple investigations made by all the other physicians, ordered additional tests, all of which were reported to be normal, and concluded that he "simply could not make a diagnosis. I had really no feeling for what the problem was" (Woodward Deposition, p. 27).

22. Dr. Woodward referred the plaintiff to Dr. Jeanne E. Reiss for an EMG. The results of that test were negative (Id. p. 28). He also requested that Dr. Shalley administer the Minnesota Multiphasic Personality Inventory test. Dr. Woodward explained that the MMPI test was considered as "just another piece of data that one uses in an attempt to come to an opinion" (Id. p. 32). After considering that test, the EMG, and all other data, Dr. Woodward recommended that plaintiff consult Dr. Ziegler because Dr. Woodward "at that point had no other suggestions to make to her either from the

standpoint of diagnostic information or treatment" (*Id.* p. 33).

23. When Dr. Woodward saw plaintiff again on April 2, 1977, after she had seen Dr. Ziegler, plaintiff stated that her "left side was better, but that her right arm and all of her face and tongue remained very painful" and that she described her pain "as a deep, muscular pain in all major muscular groups" (*Id.* p. 35).

24. Dr. Woodward testified that "I discussed with Mrs. May, as did Dr. Ziegler, our inability to make a definite diagnosis in view of the normal neurological exam and normal x-ray and laboratory studies" (*Id.* p. 38). Dr. Woodward "was puzzled by her from the first day I saw her and I continued to be puzzled by her throughout our encounters, and I really have no good diagnosis" (*Id.* p. 51). He testified that he never did "have any idea of what was the matter with Mrs. May" and that accordingly, he did not "have any idea of what may have caused the problems" (*Id.* p. 54) In direct response to the question of whether he thought that "the swine flu vaccine could have caused the problems," Dr. Woodward testified that "in my opinion, it is not likely that it did." (*Id.* p. 55)

25. The deposition of Jeanne E. Reiss, M.D., neurophysiologist, taken April 20, 1981, was admitted in evidence and Dr. Reiss' testimony therein was that Dr. Reiss did EMG examinations of Mrs. May on March 21, 1977 and September 5, 1978 and each examination was normal. (Reiss deposition, Exhibits 2 and 5).

26. Dr. Reiss also did a nerve conduction evaluation and a repetitive stimulation test in March of 1977, finding no abnormalities. (*Id.* 7, *et seq.*)

27. Under cross-examination, Dr. Reiss testified that if Mrs. May did have GBS right after the shot and totally recovered, she should have no more complaints because if the tests came back normal, the patient is back to normal. (*Id.* 24).

28. The deposition of Dewey K. Ziegler, M.D., neurologist, taken May 12, 1981, was admitted in evidence and Dr. Ziegler's testi-

mony therein was that Dr. Ziegler examined Mrs. May on April 11, 1977. (Ziegler deposition, 12).

29. Dr. Ziegler noted that there seemed to be weakness of the proximal muscles of the legs and that Mrs. May was short of breath on exertion, there was no abnormality in the distal muscles of the legs, reflexes were normal and it was a difficult diagnostic problem. (*Id.* 14).

30. Dr. Ziegler defined a functional reaction as an impaired function of some part of the body not due to organic disease but rather due to some psychological process. (*Id.* 15).

31. In April of 1977, Dr. Ziegler thought it was possible Mrs. May may have a myopathy of some kind and hospitalized Mrs. May at the University of Kansas Medical Center for standard tests, including chemical tests, electromyogram and muscle biopsy and all test results were normal. (*Id.* 15–17).

32. Dr. Ziegler testified he didn't believe Mrs. May had GBS and he didn't know what she had. (*Id.* 18–19).

33. Dr. Ziegler testified that tests used at the time of acute symptoms are the nerve conduction, electromyogram and spinal fluid examination and he stated that if we're going to ascribe weakness to residuals of GBS then the nerve condition studies and the electromyogram tests would remain helpful. (*Id.* 24–25).

34. Dr. Ziegler did not tell Mrs. May or Dr. Theel that she had GBS, and he does not recall telling her that she had something that may have been caused by the swine flu shot. (*Id.* 25–26).

35. The deposition of Arthur R. Dick, M.D., neurologist, taken May 12, 1981, was admitted in evidence and Dr. Dick's testimony therein was that Dr. Dick was the attending physician when Mrs. May was hospitalized June 1 through June 2, 1977, at the University of Kansas Medical Center for the purpose of obtaining a muscle biopsy and having EMG studies performed. (Dick deposition, 4–5).

36. The pathologists reported on June 8, 1977 the right deltoid muscles as normal, showing no diagnostic abnormalities. (*Id.* 7).

37. Dr. Dick concluded that there was no evidence of any muscle disease and no evidence of any peripheral nerve or intercell disease at least in the muscle examined, the right deltoid muscle which was selected because at the time of the admission, the patient's complaint was of pain in all extremities but primarily, at that time, in the upper right extremity, and Dr. Dick did not think it was essential in this case to obtain results from muscles in the other areas of the body about which complaints of pain were made. (*Id.* 7–8).

38. Dr. Dick's opinion was that there was no evidence at the time of Mrs. May's hospitalization on June 1 and 2 [1977] of any disease of the peripheral nervous system, the neuromuscular system or the central nervous system. (*Id.* 14).

39. Dr. Dick stated that Mrs. May's "diagnosis" of "undiagnosed pain in both arms" was "simply undiagnosed subjective pain on the part of the patient."

40. The deposition of Philip Anton Singer, M.D., taken May 12, 1981, was admitted in evidence and Dr. Singer's testimony therein was that Dr. Singer did nerve conduction studies and electromyography and repetitive stimulation tests on Mrs. May on June 1, 1977 and concluded that there was no definite evidence of abnormality, neuropathy, or myopathy. (Singer deposition, Exhibit 3).

41. The deposition of Barry W. Festoff, M.D., neurologist, taken May 12, 1981, was admitted in evidence and Dr. Festoff's testimony there was that Dr. Festoff saw Mrs. May in the University of Kansas Medical Center on June 30, 1977. (Festoff deposition, 6).

42. Dr. Festoff did not feel that she had any evidence of neuropathic clinical signs when he examined her. (*Id.* 13).

43. During his deposition, Dr. Festoff reviewed Mrs. May's January, 1977 records from Trinity Lutheran Hospital and testified that if he had been the doctor in January of 1977 he did not think he would have ordered a lumbar puncture but he might have ordered an electromyogram and nerve conduction studies and he would not have considered the diagnosis of GBS. (*Id.* 26–27).

We find that all of the deposition testimony of all of the physicians who examined plaintiff adds up to the inescapable conclusion that no one was ever able to make a definite diagnosis of plaintiff's condition. We find that none of those physicians, as Dr. Woodward testified, did or could testify that the swine flu vaccine could have caused plaintiff's problems because none of them could determine what might have been the nature of those problems.

### H.

We believe that it is significant that plaintiff's counsel sent plaintiff to see Dr. Bernard Abrams with the obvious hope that Dr. Abrams would, after an appropriate examination, be able to testify that plaintiff had suffered from Guillain-Barre syndrome. Dr. Abrams examined plaintiff on September 5, 1978 and thereafter, on October 2, 1978, wrote plaintiff's counsel a letter which expressed regret that Dr. Abrams could not be of assistance as an expert witness. See page 128–29 of Joint Exhibit No. 1.

The first page of Dr. Abrams' October 2, 1978 letter to plaintiff's counsel stated plaintiff's complaints in great detail. Dr. Abrams there stated that plaintiff had told him that "her muscular problems resulted from the Swine Flu vaccine;" that "she received the Swine Flu vaccine on October 26, 1976 in right deltoid region;" and that "her right arm became sore." It is thus clear that Dr. Abrams understood that plaintiff's complaints related to her right arm rather than to her left arm, as Dr. Theel first recorded plaintiff's complaint on December 18, 1976 (J. Exh. No. 1, p. 64), and as Dr. Theel stated in his February 18, 1977 "To Whom It May Concern" letter (*Id.*, p. 60).

Regardless of whether plaintiff's complaints related to her right or to her left arm, Dr. Abrams advised plaintiff's counsel on October 2, 1978 as follows:

I reviewed her records from the K.U. Medical Center including the pathology report dated 6–2–78 which showed no diagnostic abnormalities.

A complete neurological examination was done on her which revealed no clearcut motor weakness or reflex abnormality nor did it reveal any consistent sensory abnormality. The cranial nerves were normal. An EMG was performed which was normal.

Summary and Conclusions: This patient had subjective symptoms following a Swine flu injection on October 26, 1976 which were reviewed by the K.U. Medical Center in a series of two hospital admissions, the first 5–25–77 and the second, very shortly thereafter for a muscle biopsy. No definitive diagnosis could be reached at that time, although that was almost 6 months after her injection and she might have by that time recovered from Guillain-Barre Syndrome. At the present time there are no objective stigmata of any Guillain-Barre Syndrome. A copy of Mrs. May's diary is perhaps the most eloquent testimony to the difficulties which she incurred after the injection. I am sorry that no definitive diagnosis can be made at this late date. It should be noted that previous EMG was done on March 22, 1977 which was normal which was in closer proximately to her illness.

I am sorry not to be of more assistance in this matter. Thank you for your kind attention to this matter. With best wishes, I remain...

Dr. Abrams' September 5, 1978 examination of plaintiff establishes that plaintiff's difficulties were as much a mystery to him as they were to all the other physicians who had seen plaintiff over an almost two year period of time. Dr. Abrams, like the other physicians, stated that "I am sorry that no definite diagnosis can be made at this late date." The inability of any physician to make a definite diagnosis of plaintiff's problems simply underlines the difficulties plaintiff faces in regard to her ability to carry the burden of proof of causation.

### I.

As we have noted above, plaintiff abandoned the factual theory that plaintiff had, in fact, suffered from Guillain-Barre Syndrome on the eve of trial. The notion that plaintiff had been diagnosed as having suffered what plaintiff's counsel labels as "a severe adverse reaction" was introduced in this case when plaintiff filed her supplemental answer to defendant's interrogatories on January 11, 1983. Plaintiff outlined her new factual theory by stating in that pleading that the "findings and psychological testing done in 1977 at the request of Dr. William Woodward and recent psychological testing done by Dr. Ruth Ilmer, Ph.D., have established that I had *a severe adverse reaction* to the swine flu shot *with both organic injury and functional manifestations . . . .*" (emphasis ours).

Plaintiff never called Dr. Ruth Ilmer either as a live or deposition witness in this case. We expressly find that neither Dr. Woodward nor Dr. Jack Shalley, who administered the Minnesota Multiphasic Personality Inventory test to plaintiff on March 28, 1977 at Dr. Woodward's request (see Joint Exhibit No. 1, page 140), ever even suggested that plaintiff suffered from a "severe adverse reaction . . . with both organic injury and functional manifestations" which they believe had been caused by the swine flu shot. Plaintiff simply never adduced any credible evidence to support the new factual theory stated in her January 11, 1983 supplemental answer to defendant's interrogatories.

We must therefore find that plaintiff failed to establish by a preponderance of all the credible evidence that she suffered what plaintiff's counsel labels "a severe adverse reaction."

### V.

#### A.

Plaintiff, in one of her final post-trial filings, supplemented her list of exhibits by

marking and offering in evidence copies of four district court swine flu opinions. Each of those cases, marked as Plaintiff's Exhibits Nos. 117 to 120, inclusive, were determined, on their respective facts, in favor of the particular plaintiffs in each of those four cases. Defendant, apparently acting on the theory that the decisions in those four cases might be considered as relevant evidence in this case, directed the final four of its post-trial findings of fact to the key medical finding of fact made in each of those four cases.

Plaintiff, of course, in her turn, responded directly to paragraphs 109 through 112, inclusive, the final four paragraphs of defendant's post-trial findings of fact. The admissions made in plaintiff's cross-fire response to each of those paragraphs of defendant's post-trial proposed findings of fact establish that plaintiff in this case does not make any factual claim that she, in fact, suffered from "bronchial plexitis," "transverse myelitis," or from "rheumatoid arthritis," as did the various plaintiffs in the four swine flu cases that plaintiff marked as Plaintiff's Exhibits Nos. 117 to 120, inclusive.

The four district court cases marked by plaintiff as exhibits in this case were as follows:

*Hasler v. United States,* 517 F.Supp. 1262 (E.D.Mich.1981) (Pl.Exh. No. 117).

*Todd v. United States,* No. 79–1053 (W.D. La.1981) (Pl.Exh. No. 118).

*Unthank v. United States,* 533 F.Supp. 703 (D.Utah 1981) (Pl.Exh. No. 119).

*Michalofski v. United States,* No. 78–568R (W.D.Wash.1983), (Pl.Exh. No. 120).

The decisions in those four district court swine flu cases may not properly be considered as substantial evidence in this case. Nor can any of those cases serve as a legal precedent in this case. For in each of those cases, the respective district courts concluded that the respective plaintiff in each of those cases had carried the burden of proving that the swine flu vaccine had, in fact, caused the particular disease each plaintiff was diagnosed as suffering from.

In *Hasler,* Judge Gilmore weighed the conflicting expert medical testimony introduced by the parties on the critical issue of causation and concluded that "it is reasonable for this Court to find as a matter of fact that the swine flu shot was the cause of plaintiff's rheumatoid arthritis." Paragraph 112 of defendant's post-trial proposed findings of fact, obviously keyed to *Hasler,* stated: "112. Plaintiff did not contract rheumatoid arthritis as Kathleen Hasler was found to suffer."

Plaintiff's cross-fire admission that "Admitted that no medical confirmation of rheumatoid arthritis *and no such claim is being made*" (emphasis ours) makes further discussion of *Hasler* redundant.[2]

The bench opinion of Judge Stagg in *Todd v. United States* was based on exactly the same rationale as *Hasler.* In finding that the plaintiff established his case "by the required preponderance of the evidence," Judge Stagg stated that "If I've got three positive witnesses on one side and a neutral witness on the other side, everybody knows what the burden of proof does in those cases" (p. 45). Paragraph 109 of defendant's post-trial proposed findings of fact stated "109. Plaintiff did not contract a branchial plexitis as Robert D. Todd was found to suffer." Plaintiff's cross-fire admission that "Admitted that no medical confirmation of branchial plexitis *and no such claim is being made*" (emphasis ours) makes further discussion of *Todd* redundant.

Both *Unthank* and *Michalofski* presented cases in which the respective plaintiffs suf-

---

**2.** On October 7, 1983, two days after we decided this case, the Court of Appeals for the Sixth Circuit reversed *Hasler* outright, *see Hasler v. United States,* 718 F.2d 202 (6th Cir.1983). The Sixth Circuit concluded that the district court's finding of fact that "the swine flu shot was the cause of plaintiff's rheumatoid arthritis" was clearly erroneous. The Court of Appeals determined that "the plaintiff has not met her burden of proof of proving causation (for the reason that) any causal connection between the swine flu inoculation and the plaintiff's rheumatoid arthritis (was) merely conjectural."

fered from transverse myelitis. Indeed, in the latter case, it was noted that "plaintiff contracted a neurological disorder which the parties have *agreed* was properly diagnosed as transverse myelitis." (emphasis ours) The cross-fire admissions made by plaintiff in regard to the two cases is in the same pattern as those made by plaintiff in regard to *Hasler* and *Todd.* Paragraph 110 of defendant's post-trial proposed findings of fact stated: "Plaintiff did not contract a transverse myelitis as Verlin G. Unthank was found to suffer." Plaintiff's cross admission stated: "Admitted that no medical confirmation of transverse myelitis *and no such claim is being made.*" (emphasis ours) And, finally, paragraph 111 of defendant's post-trial proposed findings of fact stated "Plaintiff did not contract a transverse myelitis as Olaf Von Michalofski was found to suffer." Plaintiff's cross-fire admission stated: "Admitted that no medical confirmation of transverse myelitis *and no such claim is being made.*" (Emphasis ours)

In short, any possible precedential value of the four cases which plaintiff has marked as exhibits is effectively eliminated by plaintiff's cross-fire admissions to defendant's post-trial proposed findings of fact. Plaintiff's cross-fire admissions establish that plaintiff in this case does not even claim that she, in fact, suffered from any of the various diseases which were the subject of litigation in the four cases relied upon by plaintiff in this case.

### B.

We add a word in regard to *Unthank* for the reason plaintiff also cited that case in support of her post-trial proposed conclusion of law No. 19, which stated that:

> The United States, based upon the spirit and tenor of the Swine Flu Act and its legislative history, is liable for the injuries sustained by Plaintiff as a result of the Swine Flu shot. (42 U.S.C. § 247b; see *Unthank v. United States of America,* (Plaintiff's Exhibit No. 119).

*Unthank* does not support that conclusion of law.

Although Judge Irving Hill expressly refused to follow the factual theory of *Unthank* in *Buckalow v. United States,* No. A78–283, (D. Alaska) *see* p. 98 of the transcript in that case, and although *Unthank* presently pends on appeal in the Tenth Circuit, plaintiff's citation of *Unthank* is nevertheless helpful in the sense that in that case Judge Finesilver noted that *Unthank,* like this case, was a non-GBS case and that "causation continues to be the critical issue in these non-GBS cases." [*Id.* at 723]. In footnote 36 appended to that statement, Judge Finesilver noted "the relatively few non-GBS cases where the plaintiffs have succeeded in proving their maladies were caused by the swine flu vaccine," and cited *Hasler* as an example. He further noted that:

> This case [*Unthank*] is distinguishable from previous rulings of courts in the swine flu litigation denying compensation to those plaintiffs suffering from maladies other than GBS. With the exception of those few cases holding the informed consent form to be invalid, the government has prevailed on the issue of causation in the overwhelming number of non-GBS cases. [533 F.Supp. at 723]

In the body of his opinion, Judge Finesilver concluded that "Mrs. Unthank is entitled to recover because she has proven by a preponderance of the evidence that her transverse myelitis was proximately caused by the swine flu vaccine." [*Id.* at 723] Judge Finesilver, however, made clear in *Unthank* that "our holding in this case in no way lessens the burden on subsequent plaintiffs to prove the element of causation;" [*Id.*, at 723] that "each case depends on individual family histories, symptoms and diagnoses;" and that "for example, a diagnosis of transverse myelitis without the requisite proof of causation does not render the government liable." [*Id.*, at 728]

We find and conclude that plaintiff's attempted reliance upon the four district court decisions in *Hasler, Todd, Unthank,* and *Michalofski* is untenable.

## VI.

■ In light of our finding that plaintiff failed to carry the burden of proof in regard to the critical issue of causation, it is unnecessary that we comment on the over 80 conclusions of law proposed by the parties in their pretrial and post-trial filings. Rather, we need only restate the conclusions of law which have been applied in our discussion of this case. Accordingly, we conclude that:

1. This Court has jurisdiction of this case under the National Swine Flu Immunization Program Act of 1976, 42 U.S.C. § 247b and the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2674, *et seq.*

2. The liability of the defendant must be determined in accordance with the law of Missouri, the law of the place where the tort allegedly occurred. 28 U.S.C. §§ 1346(b), 2675; 42 U.S.C. § 247b(k)(2)(A) (1976); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Petty v. United States,* 679 F.2d 719 (8th Cir. 1982).

3. Under applicable Missouri law, the plaintiff has the burden of proving every essential element of her case, including proximate causation. It was plaintiff's burden to prove that the swine flu vaccine caused whatever injury plaintiff may have suffered. *Steele v. Woods,* 327 S.W.2d 187 (Mo.1959); *Lindsay v. Wille,* 348 S.W.2d 1, 4 (Mo.1961).

4. This Court's finding that plaintiff failed to carry the burden of proving a causal relationship between the swine flu shot and her condition is dispositive of this case and there is no need to address other aspects of alleged liability.

5. Defendant's Rule 41(b) motion should be denied as moot for the reason that this Court has considered all the evidence in the case and has determined, on the merits, that plaintiff has failed to carry the burden of proving by the greater weight of the credible evidence that the swine flu vaccine was the cause of any of plaintiff's difficulties. Any conflict in evidence adduced on the critical issue of causation has been resolved in favor of the defendant.

6. Judgment should therefore be entered for the defendant.

## VII.

Accordingly, and for the reasons stated, it is

ORDERED (1) that defendant's Rule 41(b) motion should be and is hereby denied as moot. It is further

ORDERED (2) that the Clerk shall, in accordance with Rule 58 of the Federal Rules of Civil Procedure, enter judgment on a separate document in favor of the defendant and against the plaintiff.